MARION F. BERGANTZEL, APPELLANT, v. UNION TRANSFER COMPANY, APPELLEE.

FILED DECEMBER 9, 1932. No. 2851b.

*Gray & Brumbaugh,* for appellant.

*Swarr, May & Royce, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

This is an appeal from the order of the district court for Douglas county denying plaintiff's claim for compensation under the workmen's compensation law, based upon the death of her husband. The trial court determined from the evidence "that the accident by which claimant's (plaintiff's) husband lost his life did not arise out of, or in the course of, his employment by the defendant company, but from an independent cause which (employment) * * * had no causal relation to his death." The record discloses conflicting evidence as to the essential facts of the transaction in which deceased lost his life. This class of cases this court on appeal now hear *de novo.* Comp. St. 1929, sec. 48-137. "Yet, when the testimony of the witnesses upon the vital question involved is conflicting, this court will, while trying the case *de novo,* consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the other." *Southern Surety Co. v. Parmely,* 121 Neb. 146. See, also, *Jones v. Dooley,* 107 Neb. 162.

It appears without question that in the late afternoon of June 27, 1931, four truck drivers in the employ of the defendant, Union Transfer Company, viz., Price, Schnabel, Stinson and Bergantzel, were in Sioux City. Bergantzel and Stinson had completed their work at this place and were ready to start with their trucks on the return trip to Omaha. Price's truck had a cargo of wool on board which the course of business rendered necessary to transfer to the Schnabel truck. It seems, without a definite order, by common consent, for the purpose of securing a cooler place to perform this work, these four men in the trucks operated by Price, Schnabel and Stinson, respec-

tively, left the warehouse and dock of their employer, and drove to a certain point on the banks of the Missouri river, in the vicinity of Sioux City, Iowa, which rendezvous is south of and adjacent to a paved highway there extending in a general east and west direction. On their arrival at the appointed spot the Price and Schnabel trucks were placed end to end, south of and parallel to the paved road, and the transfer of the wool from the Price truck to the Schnabel truck was commenced by the persons last named aided by Bergantzel. Situated some fifty feet east of where the two trucks were thus parked, and somewhat farther south from the paved highway at this point, was what the witnesses refer to as the "shack" of one Iverson, who was engaged in selling minnows for fish bait.

The other truckers preceded Stinson to this scene. When he arrived he parked his truck south of the paved highway and some fifty or sixty feet east of the "shack." Instead of joining the three truckers, who had preceded him, in the work of transferring the cargo of wool, Stinson met Iverson and learned that a dice game was in progress in the "shack." He then abandoned, at least temporarily, the work of his employer, accompanied Iverson to the "shack" and engaged in the gambling there being carried on. After a time a quarrel over the result of a certain bet made by Stinson arose between the latter and Iverson. It developed into a fight between these two, during which Stinson received a cut on his wrist from a spade in the hands of Iverson.

Up to this point there is no substantial dispute in the evidence. Iverson testifies that, after Stinson received the cut on the wrist, Stinson called to the other three truck drivers, then at work on the two trucks. These men thereupon suspended work and all came over to the vicinity of the "shack." Stinson spoke to them, and one of the three last arriving said, "Let's get him." Then together they made a concentrated movement against Iverson in aid of Stinson. Iverson, backing up, kept off

his pursuers by swinging a spade, until one of his friends, a boy staying with him in the shack, handed him his revolver. Then, when the four continued to follow him, Iverson testifies: "I had to pull the gun and had to hold it on them until I got away from there." The evidence as to Iverson's actual movements is in agreement that the trouble started south of the "shack," and that he was chased around the east, north, west and south sides of the structure and finally made his escape, through some trees situated south and east of the "shack," to and along the paved highway leading eastward. Iverson's testimony is further to the effect that, as he had made good his escape, "Stinson said he would wait until I come back if he had to stay all night."

The testimony of Price and Schnabel is, in effect, a denial of participation in the fight first occurring; that they, together with Bergantzel, came over towards the "shack" when Stinson called to them; that they heard no threats uttered by either one of these three, and did not see any of the three physically engage in the assault on Iverson. They admit that on their arrival Stinson renewed the assault on Iverson; that the three were at all times in a relatively close proximity to the fight and in a general way conformed their movements to the movements of the principal actors therein. However, it is quite apparent from their testimony that the assault on Iverson was renewed by Stinson contemporaneous with their arrival in the near vicinity of the "shack;" that they made no effort nor exerted any influence to prevent it; that no one examined Stinson's wound, and the latter regarded it as wholly unimportant. Though one of these three was the acting foreman in charge of the work, neither he, nor any of those who accompanied him, either prior to the trouble, or during or after the assault, ever directed or requested Stinson to join them and assist in the then uncompleted work of the employer, the transfer of the wool to the Schnabel truck; and when the first figh as over, Price and Schnabel state that Stinson was

left by them keeping his vigil in the vicinity of the "shack;" Schnabel returned to the unfinished work at the truck, and Price and Bergantzel, on one of the trucks, went to a neighboring telephone, it seems, to secure, by a complaint to the police, the arrest of Iverson. When Price and Bergantzel returned from telephoning, the unfinished job of the transfer of the wool was completed by Price, Bergantzel and Schnabel. Then, leaving Schnabel to cover his load with the usual canvas, but leaving their own truck canvas still lying on the ground, Price, who testifies he was expecting trouble, with Bergantzel, went over to Stinson, who was then still in the vicinity of the "shack," keeping watch. Substantially at the time of their arrival, a Ford car, containing Iverson and two friends, drove up from the east and stopped just north of the "shack." The arrival of the automobile signaled the commencement of a second fight. Price and Stinson were active participants in this, though the part played by Bergantzel is not clear. After a time, on the arrival of Peterson, who was the foreman of defendant, in a truck driven by him, Iverson and his friends broke off the fight, made good their return to the Ford car, and drove away. Just as the Ford, in which Iverson and his friends were, was leaving, an accidental shot through the back window of the Ford to the eastward killed Bergantzel, who was then standing near the south edge of the paved road some feet east of the "shack." It is to be noted that, had the deceased remained with the truck in which he came to the scene of the misfortune, and where his work was to be performed, he would have received no injury.

In the consideration of the evidence in the record, we assume that, where an accident is in no manner related to the employment, an attempt to make the employer liable would be so clearly unreasonable and arbitrary as to subject it to the ban of the state as well as the federal Constitution. The liability is based, not upon any act or omission of the employer, but upon the existence of

the relationship which the employee bears to the employment, because of and in the course of which he was injured. *Cudahy Packing Co. v. Parramore,* 263 U. S. 418. As phrased by the Nebraska statute, compensation for death or injury provided by its terms is limited to compensation "for personal injuries to or for the death (of an employee) by accident arising out of and in the course of his employment." Comp. St. 1929, sec. 48-110. The provisions quoted are also subject to a further limitation that they are "not to cover workmen except while engaged in, on or about the premises where their duties are being performed, or where their service requires their presence as a part of such service at the time of the injury, and during the hours of service as such workmen." Comp. St. 1929, sec. 48-152.

Appellant's contention is that the instant case invokes the application of the rule that, where an employee attempts to render assistance to a fellow workman or to protect the property of the master and suffers injury in so doing, his injury arises out of and in the course of his employment. In the instant case no employer's property was endangered, and the evidence before us wholly negatives the thought that Bergantzel was killed while attempting to rescue Stinson, a fellow workman, from the effects of an injury threatened while the latter was then actually engaged in the performance of his duties in his master's employment. This principle of limitation of the employer's liability is fully recognized in each of the cases cited by appellant. Thus, in *Dragovich v. Iroquois Iron Co.,* 269 Ill. 478, 484, the court states, as the fundamental basis of the opinion: "It is clear that it is the duty of an employer to save the lives of his employees, if possible, when they are in danger while in his employment, and therefore it is the duty of a workman in his employ, when occasion presents itself, to do what he can to save the lives of his fellow employees when all are at the time working in the line of their employment." So, too, in *Matthews v. Bedworth,* 1 Minton-Senhouse W. C. C.

124, the reviewing notes in the opinion are: "Here the man (injured in attempted rescue) was in the same employment, and engaged in the same work as the one who was alive at the bottom of the pit." Similar references appear in *Yates v. South Kirby,* 3 B. W. C. C. 418, and *London and Edinburgh Shipping Co. v. Brown,* 7 Sess. Cas. (5th Series) 488.

Under the record before us, but one conclusion can be sustained, which is, that, after his arrival at the scene of this tragedy, Stinson temporarily quit the services of his master to engage in gambling, and thereafter devoted his time exclusively to the prosecution of his individual quarrel arising therefrom. In no possible sense could his transactions be considered as the transactions of the master, or for the master's benefit, or within the scope of the master's employment. And when Bergantzel sought to rescue him, if such was the fact, it was a matter wholly unrelated to the master's employment. As between the Union Transfer Company, Stinson, and Bergantzel, with reference to the transaction here involved, the indispensable, inherent, basic nexus is nonexistent. A compensable. risk must be reasonably incident to the employment, and unless there is apparent to the rational mind upon consideration of all the circumstances a causal connection between conditions under which the work is required to be performed and the resulting injury, the injury does not arise out of the employment. *Natol v. Booth & Flinn Co.,* 139 Okla. 103.

"If an employee is injured in the course of his employment in a fight which did not arise out of the employment, his injury is not compensable." *Talge Mahogany Co. v. Beard* (90 Ind. App. 611) 169 N. E. 540.

Where an employee chooses to go to a dangerous place where his employment does not necessarily carry him and incurs a danger of his own choosing, altogether outside any reasonable requirement of his position, such risk is not an incident to the employment. *White Star Coach Lines v. Industrial Commission,* 336 Ill. 117.

So, too, "An employee who suffers injury in a street brawl brought on by himself, and for his own purposes, is not entitled to compensation, even though he was engaged in his employer's business just before the fracas and intended to resume it immediately afterwards." *Wooley v. Minneapolis Equipment Co.*, 157 Minn. 428.

Indeed, this jurisdiction is committed to the doctrine: "An injury inflicted upon an employee by a fellow employee not arising from any order, direction, duty or act connected with the employment, but arising out of and occurring during or immediately following a personal altercation between the two, concerning matters not arising out of the performance or supposed performance of any duty or service in the employment, and resulting from what amounted to an assault by one upon the other, is not such an injury as will entitle the injured employee to compensation from the employer under the workmen's compensation act." *Urak v. Morris & Co.*, 107 Neb. 411. The reason upon which this rule is based is even more cogent where the party causing the injury has no connection whatever with the employer or the employer's business and the injured employee receives his injury at a place other than in or about the premises devoted to the employer's business.

After an independent consideration of the record before us, we arrive at the conclusion that the judgment of the district court was correct, and it is

AFFIRMED.