EMMA KUHTNICK, APPELLEE, v. PETER CAREY ET AL., APPELLANTS.

FILED APRIL 25, 1933. No. 28716.

*R. A. Robinson* and *Cook & Cook,* for appellants.

*Robins & Yost, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY and PAINE, JJ.

EBERLY, J.

This is an action under the terms of the workmen's compensation law of this state. The appellee, Emma Kuhtnick, as plaintiff, secured a judgment in the district court for Dodge county against the appellants. From the order of that court overruling their motion for a new trial the appellants, who will hereinafter be referred to as defendants, have appealed.

Plaintiff is the mother of Hugo Kuhtnick. This son died on March 3, 1932. At the time of his death there

was pending, undetermined, in the district court for Dodge county, an action under the Nebraska workmen's compensation law against the defendants, in which it was alleged that, due to injuries received which arose out of, and in the course of, his employment by them, Hugo Kuhtnick, as plaintiff, was entitled to certain benefits provided by our compensation law, and for the total of which judgment was prayed.

Section 48-123, Comp. St. 1929, provides in part: "The death of an injured employee prior to the expiration of the period within which he would receive such disability payment, shall be deemed to end such disability, and all liability for the remainder of such payment which he would have received in case he had lived shall be terminated; but the employer shall thereupon be liable for the following death benefit in lieu of any further disability indemnity: If the injury so received by such employee was the cause of his death and such deceased employee leaves dependents as hereinbefore specified wholly or partially dependent on him for support, the death benefit shall be a sum sufficient, when added to the indemnity which shall at the time of death have been paid or become payable under the provisions of this article to such deceased employee, to make the total compensation for the injury and death equal to the full amount which such dependents would have been entitled to receive under the provisions of the next preceding section, in case the accident had resulted in immediate death."

Upon the death of Hugo Kuhtnick, the plaintiff as a "partial dependent" commenced this proceeding first before the "commissioner," where, after an adverse decision, the action was appealed to the district court for Dodge county, in which a trial resulted in a judgment in her favor.

It also appears that the duly appointed administrator of the estate of Hugo Kuhtnick caused the pending action in which the deceased was plaintiff to be revived; that a

trial therein resulted in a judgment adverse to the administrator, who also appealed to this court.

The defendants present at the bar of this court but a single controlling contention, viz.: "That the injury causing the death of Hugo Kuhtnick, through which the plaintiff as a 'partial dependent' claims, did not arise out of and in the course of his employment by the defendants." By statute this court is required to consider this appeal *de novo,* and enter final judgment determining all questions of law and fact in accordance with the provisions of our workmen's compensation law.

The burden of proof is on the plaintiff in this case to prove by a preponderance of the evidence that the injury to the deceased, which is the basis of her cause of action, was caused to him by an accident arising out of, and in the course of, his employment by the defendants. *Bartlett v. Eaton,* 123 Neb. 599.

The evidence of the plaintiff is to the effect that at the time of the accident involved herein defendant Peter Carey was the owner of a building in North Bend, Nebraska, then undergoing repair. Defendant Eskildsen was employed in this work. At the direction of Carey, Eskildsen hired Hugo Kuhtnick to perform carpenter work on this job. Carey failed to require Eskildsen to procure liability insurance. Plaintiff's claim is that on or about March 27, 1930, while Hugo Kuhtnick was thus engaged on the Carey job, he hit the ring finger on. his left hand with a hammer while toe-nailing studding, and that this accident caused the injury from which his death resulted. From a careful consideration of all the evidence, we arrive at the conclusion that plaintiff's contention is not established by the preponderance of the evidence.

The proof is that Hugo Kuhtnick worked on the Carey job three days only, viz., March 24, 25, and 26, ten hours each day, and received pay for that time. But the week previous he had been working as carpenter on the Acom job, and at this place a sliver had become embedded in the little finger of the right hand. It was quite painful

and later blood poisoning developed in the wound. On March 21, 1930, he was treated for it at the office of a regular physician and surgeon of good standing at North Bend, whose qualifications are not questioned. In reply to questions relative to the nature of the injury, this doctor says: "Well (it was) a dangerous infection, due to the anatomical nature of the hand, the tendon of the little finger going up into the arm and also the tendon of the thumb, they both make dangerous infections because of the connection with the tendon sheath of the thumb." Further, that though "it was localized" there was "no telling how far it might travel." In reply to a hypothetical question the doctor also stated that Kuhtnick's death might have been caused by "metastatic infection through his system" tracing from the original infection he had treated. When Hugo appeared to go to work on March 24, it is clear that he still wore bandages on his hands. In his testimony before the compensation commissioner his evidence is that while on the Carey job he hit the ring finger on his left hand with a hammer while toe-nailing studding; that it did not break the finger bone, but made a sore place, a big bruise. The testimony as an entirety indicates that the incident he speaks of occurred, if at all, on March 24; that he worked two days thereafter, quitting the job on the 26th, and first sought medical attention on March 28. He claims to have mentioned the fact of his injury to a number of persons present at the time it occurred. None of these corroborate this statement, however. Their evidence is to the effect that Kuhtnick said nothing about his injury while working at Carey's to any person present, and none knew that an accident had happened.

The evidence of Hugo Kuhtnick, taken before the compensation commissioner, is that he commenced medical treatment for the injury to the middle finger of his left hand on March 28, 1930; that due to developments in other parts of his body medical treatment was continued by different physicians with no substantial interruption

to the date of his testimony in December, 1931. During this period his physical condition, though occasionally evidencing real and substantial improvement, and during much of the time permitting him "to be up and around," was such that from March 28, 1930, to December 3, 1931, he was wholly and continuously disabled from performing his work 'as a carpenter or engaging in any other gainful occupation. It also appears that the infection in the middle finger of the left hand, for which medical treatment was sought on March 28, culminated in the amputation of that member on April 30, 1930. This was diagnosed by the attending surgeon as due to osteomyelitis. On June 11, 1930, there was a further recurrence of the infection in his right arm, "red runners" appeared, and on July 4 he entered the local hospital at Fremont, where we infer this "flare-up" apparently yielded to treatment.

On October 10, 1930, the deceased went to Omaha and consulted a specialist. Under the advice of the specialist five teeth were extracted. Trouble ensued. In November following he consulted his doctor concerning a swelling on the left side of his face. By December 5, 1930, osteomyelitis had developed and an operation was necessary to remove "sequestra" from the right side of the lower jaw. Thirty days later it was found necessary to perform a similar operation on the left side of the jaw. From March 19 to April 18, 1931, the deceased was under observation and treatment at the Mayo clinics at Rochester, Minnesota. During this time it appears that a jaw operation was performed. It is also shown that infection had found a lodgement in the tissues of his lungs, and in May following his return from the Rochester hospitals an operation was performed to remove the accumulated pus in his lungs. In September, 1931, a painless "swelling with fluctuation" had developed on the posterior portion of his head. An X-ray examination showed an osteomyelitis of the occipital bone. But there was such a further development that on February 18, 1932, another operation was necessary for osteomyelitis of the parietal and frontal

bones, and the lung abscess was again drained. The patient apparently was on the road to recovery, but suffered a relapse, "and died on March 3, 1932, of general infection." The immediate cause of death is also stated in the record as "erysipelas."

The course of events just outlined was by one of the plaintiff's physicians said to be due to a "miostatic condition caused by a dissemination of organisms he had in his finger due to infection" developed therein. "It was just a flare-up in each instance of the same old condition." In short, however they may differ as to the original or initial source of the trouble, all experts testifying express, to a degree at least, the opinion that the condition presented in the instant case was essentially a blood stream infection as opposed to a localized inflammation of bone, so that it did not remain localized but was metastasized to various parts of the body where were thus created centers of infection.

On this basis plaintiff's experts, testifying in reply to hypothetical questions excluding all reference to the development of blood poisoning in the right hand of deceased, and which assumed that on March 28 the left finger was "crushed" or "mashed" at the Carey house, answered that this accident was the initial injury and responsible for the train of events that followed. On cross-examination, when required to answer hypothetical questions which embraced the events of March 20 and 21, 1930, their answers were neither positive nor persuasive.

The experts on behalf of the defendants, also responding to hypothetical questions, expressed the opinion that the initial injury causing the developments was the injury received whereby the splinter was embedded in the little finger of the right hand of deceased.

On the subject before us, Kessler on Accidental Injuries, pp. 505, 506, says:

"The R. V. A. (German state insurance office) has taken a definite stand on the relation between injury and osteomyelitis in a decision handed down on November 23,

1921, in which it is stated that the traumatic origin of a case of osteomyelitis can be conceded only when a severe mechanical trauma has taken place upon those parts of the body where the osteomyelitis later appears.

"Liniger sets up the following postulates:

"1. An accident must be proved beyond a doubt.

"2. The injury must have been sufficiently severe to have caused immediate cessation from work.

"3. The disease must make its appearance immediately after the accident, or at least within a few days after the accident. The later it appears, the more unlikely is there a connection.

"Everyone is familiar with the chronic course of osteomyelitis. The treatment of the condition taxes the ability and ingenuity of the ablest surgeons. Conditions that have been healed for years suddenly break down without any apparent reason. Examination of the bone discloses a small abcess with a sequestrum due to the inevitable effect of a few organisms that have been left behind despite extensive and radical excision. In the hematogenous type the original source of the infection may for various reasons become active and precipitate a fresh attack at any one of the old bone sites or may precipitate a new lesion. These considerations are important because of the frequent claims made that trauma is the causative agent of these renewed breakdowns. In the absence of severe injury the claims should be disregarded. Severe injury brings with it the attention of fellow workers, who can corroborate the claim of accident. Most of the claimants come in with a draining sinus and say, 'I think I bumped it against a lathe.' Such evidence should be given no weight."

In this jurisdiction we are committed to the view that, "Awards for compensation cannot be based upon possibilities or probabilities, but must be based on sufficient evidence showing that the claimant has incurred a disability arising out of and in the course of his employment." *Bartlett v. Eaton,* 123 Neb. 599.

Further, the fact that the condition of Hugo Kuhtnick might have reasonably resulted from the injury suffered as claimed by him, or that it is, conceivable that such results might have followed the same, is not sufficient to justify the conclusion, in the face of the entire record, that such condition was causally related to the claimed injury. Mere conjecture or surmise is not proof. There must be evidence to support the judgment, and the burden was upon the plaintiff to prove her case. *Green's Case,* 266 Mass. 355.

In view of the burden of proof imposed upon the plaintiff, we are of the opinion that the judgment entered in the district court is not supported by sufficient evidence.

The judgment of the district court is, therefore, reversed and the cause remanded, with directions to enter a finding and judgment for the defendants.

REVERSED.