HARRIET LOUISE MULLEN, APPELLEE, V. CITY OF HASTINGS, APPELLANT.

FILED JULY 7, 1933. No. 28703.*

*Kennedy, Holland & DeLacy, Stiner & Boslaugh* and *Edmund ,P. Nuss,* for appellant.

*R. O. Canaday, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

This. is a proceeding instituted by Harriet Louise Mullen, widow of Harley Mullen, deceased, under the workmen's compensation law. Comp. St. 1929, secs. 48-101 *et seq.* Upon trial in the district court for Adams county, judgment was entered for the plaintiff. Defendant city appeals.

The deceased, approximately 49 years of age, was employed as a member of the fire department of the defend-

ant, city of Hastings, and was on duty as such at the time of his death. About 10 o'clock p. m. on June 17, 1931, this fire department had been summoned to Ingleside, Nebraska, by the discovery of a fire in some farm buildings of the state hospital situated at that place. The deceased, as a member of this department, as operator and mechanic in charge of what is referred to in the evidence as the "fire truck and pumper," in pursuance of the duties of his employment, proceeded to the scene of this fire. On arrival of this apparatus it was ultimately placed within 20 feet of a lagoon and approximately four blocks east of the burning building. A suction pump, being a part of the equipment of the "fire truck and pumper," was placed in the waters of the lagoon, and two lines of hose connected with the "pumper" were laid toward the burning buildings, and from this source the transmitting of water to the fire was commenced. Shortly after this pumping started, one of these lines of hose burst at a point approximately 1,100 feet west of the "fire truck and pumper." Immediately after this occurrence Harley Mullen, who had just previously been engaged in operating the "pumper," was found lying on the ground, in close proximity to this machine, dying, if not dead. One witness testified that he saw Harley Mullen as this operator was falling from the pumper. But it was nighttime and the vicinity of this machine was not well illumined at this moment. Neither this witness, nor in fact any other person, is able to tell us what happened at the pumper, if anything, to cause this fall. Immediate investigation of this machine thereafter disclosed no signs of an accident. It remained in good condition except that it had "choked down."

Within three hours after the death of Harley Mullen an autopsy was performed on his body. The results of this constitute practically the entire basis of the conflicting claims of the plaintiff and defendant in this litigation.

So far as objective symptoms or evidence disclosed by this examination of this body are concerned, they may,

for the purposes of this case, be limited to the following:

"There are superficial contusions on the left temporal region and on the left malar bone, extending down over the left cheek. There is also a contusion on the lateral left palpebral cleft, and a slight contusion over the right eyebrow. Palpation of the skull reveals nothing remarkable. The bones feel smooth and solid. * * * Examination of the nose is negative excepting perhaps a few abrasions on the nasal tip. * * * Palpation of the heart reveals an apex that deviates to the left to the midclavicular line. The left ventricle of this heart is firm, not flabby; and death took place with this heart in systole. The right auricle is slightly dilated and contains blood, but the dilatation does not extend past the right sternal border. * * * Opening of the pericardial cavity shows a pericardial sac of normal thickness. The pericardial wall inside is smooth and contains a few centimeters of fluid, but this is of normal quantity. The epicardium is covered with a good layer of fat, the fat increasing as it goes toward the auricles. The heart is of normal size, is not roughened to the palpating finger, and inspection reveals nothing remarkable. * * * An incision was made through the scalp transversely over the vertex. The anterior flap of the scalp was peeled forward and loosened to the supraorbital ridges. The contusion over the frontal bone shows slightly on the epicranium manifested as small hemorrhagic areas. No fracture is palpable or visible. The posterior flap of the scalp was peeled backward to the external occipital protuberance. No contusions or fractures are palpable or visible. The cranial osseous cap was removed with a saw. The cerebrum was inspected and no abnormal changes were visible. The blood vessels and color were normal. No areas of hemorrhage were seen. The brain was lifted and the anterior and middle fossæ were palpated and inspected. These were free from blood or bloody extravasations. No fracture or pathology was seen. The tentorium was split lateralward, releasing the

cerebellum. No fracture or any abnormality was found in the posterior fossa. Numerous sections were made through the hemispheres and their nuclei, but no hemorrhagic areas or pathology was visible. * * * Sections of the cerebellum show nothing remarkable. * * * The pathological diagnosis is as follows: Healed pulmonary tuberculosis. Chronic pericholecystitis. Heart in strong systole. The immediate cause of this man's death was perhaps some physical or even emotional stimulation that produced the *post-mortem* systole of the heart."

The physician performing the *post mortem,* called as a witness by plaintiff, testified in part as follows:

"By contusion we mean either a slight hemorrhage or a bluishness of tissue, which may be involving the second layer of skin." Further, that while personally he had never seen it, medical authorities record cases where contusions in the region where found on this body have caused death without causing lesions in the brain, or leaving any trace in the brain itself, and without a fracture of the skull. In these cases the contusion might not be greater than presented here.

The examination of this witness also included the following:

"Q. Now you examined the heart, and your findings show that it was in systole. Will you tell the court what that means? A. It means that the heart is in contraction. * * * Q. And that was the only unusual feature you found about the heart, was it? A. The only unusual feature about the heart; yes. Q. What was your conclusion then as to the cause of this man's death, Doctor? A. Well, I did not arrive at any particular conclusion as to this man's immediate death, as far as I could determine by the autopsy. * * * Q. You have had cases, have you not, Doctor, in an autopsy where one was conducted, where the cause of death could not be determined? A. It couldn't be determined; yes. Q. And the same might be true of Mr. Mullen here? A. That is possible. Q. Well,

as far as you could determine anything, you put it into your report at the time that you made it? A. Yes, sir. Q. Your report stated your conclusions on that? A. Yes."

The assistant in performing this *post mortem,* a licensed physician of seventeen years' experience, also testified with reference to the "bruises," and stated that in performing the autopsy he noted a contusion on the left side of Mullen's head, which was probably an inch and a half or two inches across; that it was a reddened area on the left side slightly over the eye and down on the cheek; that it was evidently caused by a fall; that he would say that these bruises in the region where found on Mullen's head could not be sufficient to produce death without leaving lesions on the brain or affecting the skull.

In a careful reading of plaintiff's evidence, we are unable to find any simple, direct statement, in substance or effect, either that Mullen did not die from natural causes, wholly unconnected with the performance of his duties; or that he died from some external means connected with, or caused by, or arising out of his employment; or that in their opinion the force causing the bruises on his face caused his death. This conclusion necessarily includes statements involving the terms "may," "possibly," or "perhaps."

Plaintiff's evidence in the trial court presented two theories to support her recovery, viz.: First, at the moment of the bursting of the hose a solid stream of water issuing from the rent came in contact with an electrical wire charged with 110 volts, and, together with the water confined in the remainder of the line of hose, formed a conductor over or through which the electric current came in contact with the deceased, causing his electrocution; second, that the bruises on his face evidence the application of a force which caused his death.

We are convinced by the evidence in the record that at the time the hose burst there was no current whatever on

the lines with which the escaping water came in contact, and that electrical current or electrical shock in no manner caused or contributed to the death.

On the other hand, we have the testimony of defendant's expert, a licensed physician of good standing, who, though not present at the autopsy, made a superficial examination of the body after death. He noticed a contusion or abrasion about the supraorbital region and the cheek, and across the nose. He described it as having the appearance of what is known as a brush bruise or a scuffing of the skin and flesh about that region. Further, that taking into consideration all the findings of the autopsy report, in connection with the observation he made, there was nothing on which he could base a conclusion as to the cause of death; and that it is just as possible that Harley Mullen died a natural death as a death resulting from an accident.

These conclusions were sustained by the evidence of a second expert testifying for the defendant, and indeed there appears to be no substantial contradiction thereof by plaintiff's witnesses.

It is also quite apparent that while we have evidence in the record that the deceased, at the time he left home on the evening of his death, "was in fine health, good and jolly disposition, and everything," we find no affirmative evidence as to the then condition of his face, where the bruises were discovered some four or five hours later, either when he left home or immediately prior to his departure for the fire. There is no evidence of any force applied to the left side of the head prior to his fall from the "pumper." Whether the bruises were on his face when he started to fall, or appeared only from and after contact with the ground at the conclusion of the fall, the evidence is silent; and whether he died as he started to fall, or died as a result of it, the evidence does not inform us. Considered as a normal man, neither the bruises nor the fall would ordinarily cause his death. Thus we have

here a death, so far as this cause is concerned, surrounded by mystery. Under such circumstances the applicable principle appears to be:

"Where an employee dies suddenly and mysteriously while engaged in his work, the burden of proof that his death was an accident arising out of his employment rests upon the administratrix, and such proof must amount to something more than mere guess." *Bloomington, D. & C. R. Co. v. Industrial Board,* 276 Ill. 454.

In this jurisdiction we are required to try compensation cases *de novo.* Comp. St. 1929, sec. 48-137; *Travelers Ins. Co. v. Ohler,* 119 Neb. 121; *Southern Surety Co. v. Parmely,* 121 Neb. 146; *Siedlik v. Swift & Co.,* 122 Neb. 99; *Bergantzel v. Union Transfer Co.,* 124 Neb. 200; *Stone v. Thomson Co.,* 124 Neb. 181.

We are also committed to the view that the burden of proof is on the party bringing suit for death of an employee to prove by a preponderance of the evidence that the personal injury causing such death was caused by an accident arising out of and in the course of the deceased's employment. *Omaha & C. B. Street R. Co. v. Johnson,* 109 Neb. 526; *Bartlett v. Eaton,* 123 Neb. 599; *Townsend v. Loeffelbein,* 123 Neb. 791; *Uribe v. Woods Bros. Construction Co.,* 124 Neb. 243.

In this class of cases this tribunal is bound by the principle that awards of compensation cannot be based on possibilities or probabilities. *Bartlett v. Eaton,* 123 Neb. 599; *Townsend v. Loeffelbein,* 123 Neb. 791.

We have before us, it is clear, a claim supported, if at all, only by "possibilities and probabilities."

It follows that the district court erred in awarding judgment for the claimant. This judgment is therefore reversed and the action dismissed.

REVERSED AND DISMISSED.