PAT HUDSON, APPELLANT, V. CITY OF LINCOLN, APPELLEE.

FILED JANUARY 11, 1935.   No. 29367.

*Sorensen, Kyle, Newkirk & Rein,* for appellant.

*Max Kier* and *Lloyd E. Chapman, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and ELDRED, District Judge.

ELDRED, District Judge.

This is a compensation case. It appears that the appellant, Pat Hudson, at the time of the accident involved herein, was employed by the appellee, city of Lincoln, cleaning a sewer. He claims that while thus employed, on the morning of July 8, 1933, he sustained an injury to his right eye. The sewer cleaning job was being done by winches, cable, blocks and bucket. The terminal winches were set up over the manholes leading from the surface to the sewer. At the bottom of each manhole, and in the sewer, was a block through which the cable was pulled. On July 8, 1933, in the progress of the work, the cable, which was spliced, would not go through one of the blocks at the point of splicing; the block had to be taken apart and set up again ahead of the splice. To do this work Hudson went down into the manhole and, taking hold of the block, found that it was clogged with rags and débris; and while pulling on one of the rags it suddenly came loose and flew into Hudson's face, striking him on the surface of the right eye. There is no substantial conflict in the testimony as to the foregoing facts. It is contended that since said time his right eye has been substantially sightless. The compensation commissioner decided the issues involved in appellant's, Hudson's, favor, and awarded him compensation.

On appeal to the district court for Lancaster county, the court found the issues in favor of the appellee, and that the plaintiff does not now have and never did have any disability from any accident arising out of and in the course of his employment by the city of Lincoln, and dismissed the action. The plaintiff, Pat Hudson, has appealed.

The decisive question for determination is whether the disability of which the plaintiff complains is due to an

accident arising out of and in the course of his employment by the city of Lincoln. This involves a consideration of the evidence bearing upon that question, which was principally given by four witnesses who testified as eye specialists; all of whom appear to be well qualified, both from preliminary study and education, and long experience in their profession.

Pat Hudson, the appellant, testified: The accident happened July 8, 1933, about 9:00 a. m.; he worked the balance of the day; the foreman sent him to Dr. Campbell, who treated his eye and told him, if he got no better, to report back; was required by Dr. Campbell to medicate his right eye every three or four hours; the eye was inflamed and burned continuously for four or five days; after that it cleared up; as he unbandaged it he noticed he could not see out of that eye; just the light was about all; had never experienced any trouble with his right eye prior to the time of the accident. Plaintiff had gone to school, read books and papers, and engaged in marksmanship. Dr. Campbell advised him to consult an eye specialist; he went to his family doctor, Miles Breuer, who sent him to Dr. Earl B. Brooks.

The first specialist to examine the plaintiff's eye after the accident was Dr. Brooks. The plaintiff was taken to him by Dr. Breuer, plaintiff's family physician. Dr. Brooks examined him on July 17, and again on July 21. After the second examination plaintiff did not again return to Dr. Brooks, but went to see the compensation commissioner, who sent him to Dr. Sanderson. July 22, 1933, he was first examined by Dr. Sanderson, who, at the suggestion of the compensation commissioner, kept him under observation and continued with his examinations and treated plaintiff from once a month to as many as four times a month, up to May 9, 1934.

On August 17, 1933, Dr. Hompes first examined the plaintiff, and on August 21, 1933, he was first examined by Dr. Thomas; these examinations being during the time Dr. Sanderson had plaintiff under observation. Drs.

Brooks, Hompes and Thomas all examined plaintiff's eye again on May 14, 1934.

In the opinion of Dr. Sanderson the defective vision of plaintiff's right eye was due to an injury received at the time of the accident involved herein. While the opinions of Drs. Brooks, Hompes and Thomas were all opposed thereto.

Dr. D. D. Sanderson; practiced 23 years; specialized, eye, ear, nose and throat; first examined Pat Hudson on July 22, 1933; the examination was made at the request of the compensation commissioner; obtained from Hudson a history of the accident and went through the usual routine of examining the eye; found that he did not see as well with the right eye as he did with left, and found his field of vision indefinite; rather a little blurry; there was especially one area that he complained of seeing not at all definitely, or being completely absent; his field, as far as distance around was concerned, was practically normal; he could get objects out toward the side; his cornea was comparatively clear; his lens was clear, and his media was practically clear, but the fundus showed a very definite area in the lower area of destruction that was probably congenital, and that accounted for the blurry sensation that he spoke of in the upper field that he could not see. The nerve head was definitely congested; that is, it showed small streaks extending out from the nerve head itself, over the area in the eye where the nerve head comes in and spreads out over the inside of the eye; it extended more toward the central portion of the eye, that we see with; was not definitely swollen; on the surface you would call it irritated. His vision in the eye he complained of at that time was approximately 10/200; that is, he could read at ten feet what he should read at two hundred feet, and with the other eye he could see normally; that is, approximately, at the first examination. At the request of the compensation commissioner the witness kept Hudson under observation. Saw appellant on July 24; at that time his pupils reacted practically normal; his tension at

that time was, according to the instrument used in registering tension—which indicates the pressure of the eyeball—a little higher in the right eye than in the left; sometimes each eye may vary a little; but the right eye was 45, compared with 35 in the left eye. On a number of occasions, during the several months following, witness observed the patient, made different examinations, and different treatments were administered to determine whether the condition was bacteria or traumatic. Throughout this period, witness testifies, the tension of the right eye was considerably greater than that of the left. The vision of the right eye varied somewhat on each examination. In January the fundus remained about the same; still that little fine minute area of congestion around the nerve head, with some very fine areas out at the edge that appeared as if they evidently could continue to a definite atrophy. A chart made of his field of vision, the last time witness saw him, showed a very marked narrowing of his general field of vision. During this time it had changed in the fundus area, and in the area of the nerve head, from a minute inflammatory area to a little more exaggerated and a little more atrophic. At the present time there is a little more atrophy developing. The atrophy is right at the nerve head extending over into the macula area; there is still some inflammatory tissue in that area. The opinion of the witness was that plaintiff's eye was not amblyopic from nonuse. Asked for an opinion as to the cause of the inflammation and atrophy in the macula area of the fundus of the eye, witness stated: "Through the use of protein and vaccine therapy and observation of him over a period of time I was unable to find any evidence of infection causing his difficulty. He did give a definite history of injury, although it appeared at the time as if it was slight; but ever so slight a bump on the anterior part of the eye may cause a rupture in the back part of the eye and sufficient injury to cause all of his difficulty. * * * And therefore since I cannot find anything except a definite history of injury there is no doubt but

what his injury caused it, because it does do it." And stated further his opinion that the atrophy and infection are primarily the result of the injury.

This evidence would seem to disclose but a possibility, or, at most, a probability as to the cause of the conditions of plaintiff's right eye.

Dr. M. F. Arnholt, superintendent of the department of health of the city of Lincoln: In the latter part of July or early August, had a conversation with Dr. D. D. Sanderson relative to an examination he had made of Pat Hudson. "I put the question to Dr. Sanderson, 'Could this present disability or lack of vision be due to an old disability?' and he said, 'It could be.' 'Well,' I said, 'Is it?' and he hesitated somewhat and came back with this answer, 'That the city would save a lot of money if they examined those persons' eyes before they were employed.' "

Dr. Earl B. Brooks, physician specializing in ear, eye, nose and throat: Practiced since 1905; examined Pat Hudson July 17, 1933. "He was brought to my office by Dr. Miles Breuer" (plaintiff's family physician) ; examined him that day; also on July 21, 1933; and again May 14, 1934. Was given history and made examination; examined the lids, and the tissue of the eye, and of the cornea, that is the clear anterior segment chamber, and iris and media; there was no nystagmus or unusual movements of the eye. The right fundus was clear. The ocular movements were normal. Pupils were round, two to two and a half m. m. in diameter, equal, reacted normally, both direct and consensual, tension was normal. The retinoscopy, right eye sphere plus 5, left eye plus 1.50. Right vision 22/100, left vision 20/15. With the malingering frame at ten feet, right eye, he reads 10/40. He says that he does not see the red. Diagnosis: Amblyopia exanopsia right, with hyperopia. Made a thorough and complete examination; the finger tension was normal; the lids of the right eye showed a slight hyperæmia; lachrymal apparatus, anterior chamber, cornea and sclera were clear, iris brown and mobile, lens and media clear. The ophthalmoscopic ex-

amination, that is, an examination of the interior of the eye, the right fundus was clear. There is an area in the region of the macula that shows a slightly stippled effect, slight pigmentation. The right vision was 20/60, minus three. Saw him again on July 21, and at that time he admitted 22/100 vision only in the right eye; that means that he had slipped apparently from 20/60, minus three, to 22/100; read at 20 feet letters that he should read at 200 feet; apparently that much loss of vision in four days. On that day examined all of the tissues of the eye in a similar manner as on the 17th of July. "I examined particularly carefully the fundus, retina, the inner coats of the eye and anterior, and we found that the two fundi were identical as far as I could make out. * * * There was no injury there. * * * The fundi is the back of the eye that you see as you look into it with an instrument which we call the ophthalmoscope, it has a battery of mirrors which reflects the light into the eye, you get a round appearance, it is the head of the optic nerve, and coming from them the central artery and veins and spreading out like the branches of a tree into the superior nasal and temporal branches, * * * and branching like the branches of a tree. And they appeared normal in both eyes." Used an ophthalmoscope in making the examination. The arteries, veins and nerve head were normal. "We took a Wasserman, which was negative. I intimated to him that it was rather unusual to get that much discrepancy in vision in four days, and that I had misgivings he was not reading with the right eye as good as he could; and after that date he didn't consult me any more until last evening. * * * My conclusion was that his loss of vision was not due to the injury or accident that he had sustained; that he did have an error of refraction which accounted for some loss of vision. The man might honestly have discovered about that time that his vision was not as good in his right eye as in the left, but it did not seem reasonable in four days that that vision had slipped that much with nothing to show for it in the way of physical findings.

* * * Now, do you have an opinion as to what was the cause of this error of refraction? Well, it has been testified to here before, he was born with a faulty shaped eyeball, the anterior posterior axis is undoubtedly short, in fact, a great percentage of people are born with hyperopia; when that discrepancy is too great, as Dr. Hompes pointed out, when the discrepancy between the two eyes is great the brain learns to fix with the eye on the object, but we get a separation of the image with the poor eye, and then from disuse we have blindness and loss of sight that comes from this disuse."

On May 14, 1934, he examined Mr. Hudson again. "We went through an examination of the ocular muscles, the pupillary reactions, the tension, an examination of the lids and lachrymal apparatus, the conjunctiva and the cornea, the sclera, iris, lens and media and found there no evident lesion. Examining the eye with an instrument called the ophthalmoscope he showed curvature of the cornea which would mean some astigmatism on the top of the area of refraction. * * * That might be partially acquired and might be congenital." After the last examination, reached the same conclusion as he had after the examination on July 17 and July 21. "In my opinion the accident didn't cause this defective vision that he claims in his right eye." Examined the eye with all the skill and judgment possessed, both at the beginning and at the time the last examination was made, and did not find the entrance of the optic nerve atrophied or inflamed. Did not find any infection, or any trace of infection. "I looked carefully for evidences of scars or disturbances of the iris, or anything that would indicate hemorrhages in the retina, or patches of atrophy in the retina that might come from an injury or an inflammatory process as a result of infection. * * * I felt that there was a lesion there."

Dr. J. J. Hompes, physician, specializing in eye, ear, nose and throat; practiced since 1908; examined Hudson August 17, 1933; examined him again on May 14, 1934. In giving history Hudson stated he had previously had his

eyes examined in school and had never been told he had anything wrong with them; never had his eyes examined by any one outside of the public school, and had never worn glasses. On examination found his eyes normal in appearance; his eyelids and mucus membrane, and the cornea and the surface of the eye were normal; there were no scars, thickening of the tissue or inflammation in these parts. The extrinsic muscles which control the motion of the eyeball, and vision and pupils were normal, equal in size and acted normally to stimulation. The crystalline lens, the retina and optic nerves of both eyes were normal in appearance. There was no defect in the structure of either the right eye or the left eye to indicate that they had ever been injured. The vision in the right eye was defective, and in the left eye the vision was 3/40, meaning that he saw at three feet an object he should be able to see at forty feet. Diagnosed case of defective vision as due to hypermetropia, meaning farsightedness; that due to the great inequality of vision in the two eyes he has used the better eye, the left eye, to the disadvantage of the right eye. In the language of ophthalmology, the condition of the right eye is known as amblyopia exanopsia. That means a defect in vision from disuse. This condition is one commonly found in cases where there is a great inequality of vision, especially is this condition likely to result where, as in this case, the person has never worn glasses. The fields of vision were normal in both eyes. This is a case, "in my opinion, of defective vision from lack of wearing proper glasses, the defect has existed for a long time, and will remain about the same throughout the rest of his life. He has not sustained any injury to his eye of a permanent nature, nor has it been affected in any way by the accident he claims." Made examination of all parts of the eye; would have detected any inflammation or disease of the optic nerve where it enters the orbit, had there been any. Examined the plaintiff again Saturday evening (May 14). "I went over all this material and examined him in the

same way that I did before, excepting that I did not refract him, and I did not take his fields of vision over again * * * and I found no change, and nothing different than I found on the examination on August 17, 1933. I did one other examination in addition, I examined the surface of his eye and the interior one-third of his eye with a cornea microscope that gave me magnification of 44 diameters and I didn't find anything more than I found in the previous examination. Q. (By the Court) You didn't find any atrophy there? A. That has to do with the interior segment of the eye and cornea and lens and the fluid medias of the eye back about one-third. The optic nerve was examined and the retina and the medias and they were all normal, or were last night at 5 o'clock."

Dr. J. W. Thomas, practiced his profession 24 years, specializing in eye, ear, nose and throat; examined plaintiff's eyes August 21, 1933, and again the night before the trial, May 14, 1934. The first examination was made at the request of the labor commissioner. The history given him was that plaintiff was struck in the eye while working in a sewer ditch for the city, July 8, 1933; some sewer mud was removed from the eye on the date he was hurt. The examination of his eyelids was negative; no inflammation of the eyelids, either inside or out, and no swelling. Motion of the eyeballs was normal; pupils were normal in size and reacted to light and accommodation. The tension, which is the pressure of the eyeball itself, in the right area was 22 millimeters; of the left eye 18 millimeters with Schiotz' tonometer. The examination of the eye grounds of the retina and the head of the optic nerve was negative. There was no pathology. The fields were taken and were normal in both eyes for white. The patient had fusion; that is, he had vision in both eyes and was able to fuse the two eyes on an object. An examination of his vision was made, and the subjective findings, that is, the findings with the patient's statements of vision were of the right eye at twenty feet 22/100, and the left eye 20/15, minus three, and the vision of both eyes 20/20. Under

drops the refraction did not change. Found nothing in the examination that indicated that the plaintiff had any disability of the right eye as a result of the accident. The various details of the eye were normal, except the vision and the refraction; the refraction showed a high area in both eyes, being greater in the right eye. This was not a result of injury; the difficulty of vision is a condition called amblyopia exanopsia, which means loss of vision because of disuse. In the opinion of the witness, "this man, and practically all people who have this condition, were born with it." His opinion being based on his observation and experience. The eye grounds, fundus, were normal; "I might amplify that statement by saying that any rupture of the macula or of the retina in any part of it would be easily obvious, and no such condition could possibly exist in the eye of Mr. Hudson at the time I examined him." There was nothing in the last examination, May 14, 1934, to cause the witness to change the conclusion previously formed. In making the examination, went clear to the back of the eye, the anterior portion, where the big nerves come from; "that is what we speak of as the fundus;" found no inflammation there; found it normal.

Mrs. Matilda Hudson, mother of the plaintiff, testified he attended school until he reached the eighth grade. Read books and papers. He never used glasses. That previous to the accident he had never experienced any trouble with his right eye.

And plaintiff himself testified that he engaged in marksmanship. To what extent, or with what success, is not disclosed. One witness testified he went hunting with the plaintiff two different times. The testimony as to other lines of work or employment in which the plaintiff had been engaged is not such as to indicate whether the vision of one of the plaintiff's eyes may or may not have been defective. The fact that the plaintiff may or may not have experienced any previous difficulty with his right eye does not detract from the conclusion reached by Drs.

Hompes, Thomas and Brooks, the latter witness stating: "The man might honestly have discovered about that time that his vision was not as good in his right eye as in his left."

In compensation cases it is incumbent upon the plaintiff to prove his case by a preponderance of the evidence. *Saxton v. Sinclair Refining Co.*, 125 Neb. 468. Awards in such cases cannot be based upon possibilities or probabilities merely, but the preponderance of the evidence must show that the workman suffered a disability because of an injury arising out of and in the course of his employment. *Mullen v. City of Hastings*, 125 Neb. 172. Further, in a proceeding under the workmen's compensation law, where, as in this case, "the evidence is conflicting, the supreme court upon a trial *de novo* may consider the fact that the district court gave credence to testimony of some witnesses rather than to contradictory testimony of other witnesses." *Sherman v. Great Western Sugar Co.*, 127 Neb. 505.

On trial *de novo* this court finds that the plaintiff has failed to establish, by a preponderance of the evidence, that he sustained a compensable injury as the result of an accident arising out of and in the course of his employment by the defendant, the city of Lincoln.

Error is assigned in the rulings of the trial court on the admissibility of certain evidence offered by appellant. We have examined all of the assignments, and find no prejudicial error in such rulings.

The judgment of the trial court is

AFFIRMED.