PAT O'CONNOR, APPELLEE, V. DANIEL M. ABBOTT ET AL.,
APPELLANTS.

279 N. W. 207

FILED APRIL 15, 1938. No. 30339.

*Paul P. Chaney* and *Chambers, Holland & Locke,* for appellants.

*LeRoy G. Stohlman, contra.*

Heard before GOSS, C. J., ROSE, DAY, PAINE and MESS-MORE, JJ.

GOSS, C. J.

This is an appeal from a judgment of the district court affirming an award of the workmen's compensation court.

This was a second complaint filed by O'Connor. In the first petition O'Connor claimed that on July 3, 1936, while engaged in his duties as a night watchman for Daniel M. Abbott, his employer, he fell from a window and sustained compensable injuries. An award was made in his favor and defendants appealed. Thereafter a rehearing was had and the compensation court entered an order dismissing O'Connor's petition. He took no appeal.

Later O'Connor filed another complaint in the compensation court, in which he contended that he suffered a heat-stroke about 4:30 p. m. on July 3, 1936, arising out of and in the course of his employment by Abbott as a hod-carrier, and as a direct result of the heat-stroke he fell from a window about 11:30 the same night and received compensable injuries. Defendants, in addition to the usual denials, pleaded that the matter had been adjudicated in the first hearing. Plaintiff's reply denied that the matter adjudicated was the same as alleged here. The compensation court heard the case very fully on the evidence and made an award in favor of O'Connor. Defendants appealed. The case was tried in the district court on the evidence contained in the bill of exceptions brought up from the compensation court. The district court affirmed the findings of the compensation court and awarded an attorney's fee of $150 to O'Connor's attorney. Defendants appealed to this court.

The main question is whether the evidence is sufficient to sustain the findings of the district court. The workmen's compensation law was amended by chapter 57, Laws 1935. The particular change to which we call attention is carried forward into the 1935 Comp. St. Supp. as section 48-174, in these words: "Provided, that a judgment, order or award of the district court may be modified or set aside only upon the following grounds: * * * (3) That the findings of fact are not conclusively supported by the evidence as disclosed by the record, and if so found, the cause shall be considered *de novo* upon the record. (4) That the findings of fact by the court do not support the order or award."

The evidence establishes that O'Connor was, at the time alleged, July 3, 1936, employed by Abbott, and on that day the official record showed the temperature reached 106 degrees and that there was some breeze. Abbott was engaged upon a contract to repair a hotel and the particular employment of O'Connor was the preparation of plaster and carrying it upstairs to the plasterers. The

mortar was mixed on the street, but in such a position that the sun beat down upon O'Connor as he was mixing it and the wind was largely prevented from reaching him by the buildings and trees and material. He had to carry the mixture upstairs and deliver it to the two plasterers he was serving. There is evidence that he complained of the effect of the heat and that he ceased to work about 4 or 4:30 o'clock because of the heat. O'Connor himself testified that he felt nervous and fidgety, and when he was carrying the last hod of plaster upstairs he had a dizzy spell, objects in the form of "black beads came in front" of him, he craved something cold to drink, had to rest on the stairs, dumped his hod for the plasterers to use the plaster, and quit. He had cramps in his stomach and was sick. So he quit carrying plaster, but after a rest of perhaps ten minutes he broke up some chunks of lime to get it soaked, and after that he quit for the day. His testimony is that he did not get away from the job until 7:30 at night. Then he had supper of cornflakes and milk and went for a walk of about two miles to the Burlington depot and got a ride back, looked at the job about 10:15 p. m. and saw that it was all right. He then drank three bottles of beer, went to his room in the hotel they were plastering, got a cramp in his right leg and a cramp in his left side and abdomen, went to the window for air and to rub his leg, claimed to have lost consciousness, fell out and was injured.

Dr. Clayton Andrews, a member of the medical advisory board of the state of Nebraska, testified on behalf of O'Connor that O'Connor appeared on September 15, 1936, and he took a history of his illness and examined him. Answering a hypothetical question, purporting to contain the elements of the history of O'Connor's condition on July 3, 1936, and asked whether O'Connor had sustained a heat-stroke on that day, the witness said: "He was very definitely affected by the heat. Whether or not you should call it a heat-stroke is simply a matter of degree. All people who have heat-strokes do not

lose consciousness. In my opinion he was made ill by the heat. That is the fairest way it can be stated." This doctor expressed the opinion that three bottles of beer would not cause intoxication of an adult person.

Dr. C. L. Hustead of Falls City, who has practiced medicine 25 years, testified that the man was brought in about midnight of July 3, 1936; he described his injuries and said he was under the influence of liquor; he was led to that conclusion because the patient was "quite talkative, very rank liquor breath—odor upon his breath—and he admitted to me, told me he had been drinking very heavy of 12 per cent. ale." The patient came back to the hospital the next day and remained two days. This doctor testified that, when the patient was examined, his "pulse was slow, which would be directly opposite what you would get with a heat-stroke, his respiration was regular and normal, not labored, which is directly opposite what you would get in a heat-stroke, wasn't any psychosis, but he did have a lot of flush on his face, had had no vomiting, I asked him about the vomiting; he did have a terrible rancid liquor breath—beer odor on his breath—he had no symptoms I would connect with heat-stroke in any manner, shape or form."

Dr. Hustead testified that O'Connor gave him no history that he had been overcome by the heat during the day.

It is patent that the claim of O'Connor having been defeated in his suit for compensation on the ground that he was employed as a night watchman and fell out of the window while he was so engaged is not *res judicata* of the present claim that, while in the employ of Abbott, he suffered a heat-stroke during the afternoon, and at 11 or 11:30 p. m., while suffering illness as a result of that heat-stroke, fell out of the window and injured himself. Each is a separate case and stands on its own facts. That he was unable to prevail in his first claim as to the nature of his employment does not defeat or affect the present claim. A judgment will not operate as *res*

*judicata* unless it appears on the face of the record, or is shown by extrinsic evidence, that the precise question was raised and determined in the former suit.

But, in the present claim, it is not clearly shown that the fall was occasioned by the alleged heat-stroke. It may be conceded that, in the place where O'Connor worked in mixing the mortar, it was hot during the afternoon and that he was shut off from the effects of the breeze, and therefore subjected to a greater hazard from the heat than others in that neighborhood. But he had been able to carry on his arduous work of mixing the plaster and carrying it to the workmen plastering on the second floor until 4 or 4:30 p. m. of that afternoon. After that hour he did not finally leave the job for the day until about 7 o'clock, before which time he had slacked the lime for the batch of the next day. After that he was able to eat his evening meal, to walk two miles to the Burlington depot, and otherwise to put in his time until about 11 o'clock, when he went to his room and the injury occurred as heretofore related.

We do not derive from the record the facts sustaining the judgment of either the compensation court or the district court that we understand it was incumbent on the claimant to prove. We are of the opinion the proofs fail to show that the claimant sustained his injury as a result of a heat-stroke suffered by him while he was working during the day of his accident, and that the proof depends too much upon the possibility, or at the very strongest upon the probability, that the alleged heat-stroke caused him to fall from the window and be injured. The facts that he was able to slack his lime for the next day, that he was able to walk two miles to the depot, and that he spent the evening without any great discomfort seem to us to fail to raise his proof to any standard higher than that of a possibility that the effects of the heat-stroke of the afternoon persisted and caused him to fall from the window. It is not necessary for us to adopt the suggestion of the evidence that he was intoxicated and

that caused his fall from the window. In a recent case, *Price v. Burlington Refrigerator Express Co.*, 131 Neb. 657, 269 N. W. 425, we said:

"In a suit under the workmen's compensation law, the burden of proof is upon the claimant to show that he suffered an injury and that the injury resulted from an accident arising out of and in the course of his employment.

"Awards for compensation cannot be based upon possibilities or probabilities. They must be supported by evidence showing that claimant has incurred a disability arising out of and in the course of his employment."

The ruling in the above case is supported by many cases in recent years: *Bartlett v. Eaton*, 123 Neb. 599, 243 N. W. 772; *Townsend v. Loeffelbein*, 123 Neb. 791, 244 N. W. 418; *Kuhtnick v. Carey*, 124 Neb. 762, 248 N. W. 89; *Mullen v. City of Hastings*, 125 Neb. 172, 249 N. W. 560; *Huffman v. Great Western Sugar Co.*, 125 Neb. 302, 250 N. W. 70; *Saxton v. Sinclair Refining Co.*, 125 Neb. 468, 250 N. W. 655; *Hudson v. City of Lincoln*, 128 Neb. 202, 258 N. W. 398; *Milton v. City of Gordon*, 129 Neb. 888, 263 N. W. 208.

For the reasons stated, the judgment of the district court is reversed, with directions to enter a finding and judgment for defendants.

REVERSED.