BESSIE E. SAXTON, GUARDIAN, APPELLANT, V. SINCLAIR REFINING COMPANY, APPELLEE.

FILED OCTOBER 27, 1933. No. 28866.

*Gray & Brumbaugh,* for appellant.

*Kennedy, Holland & DeLacy, Edward J. Svoboda, Ralph E. Svoboda, Walter E. Brown* and *C. L. Canfield, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY and PAINE, JJ., and SHEPHERD, District Judge.

SHEPHERD, District Judge.

Upon appeal taken from the decision of the compensation commissioner awarding compensation for total permanent disability, this case was tried in the court below and dismissed on the ground that the ailment complained of did not in any wise result from the accident alleged as the cause thereof. The case is one in which Delmar Saxton is suffering from schizophrenia or dementia præcox, and in which Bessie E. Saxton, his guardian, charges that his affliction is due to an injury sustained by him in an automobile collision. The case is now here on appeal duly taken from the decision of the district court.

The assignments of error may be stated in a single sentence. The decision rendered by the trial court is not sustained by sufficient evidence and is contrary to the evidence and to the law. It may also be said that the

appellant complains of errors of law occurring at the trial and duly excepted to. But this assignment is not discussed in the brief and was not argued orally.

Errors of law occurring at the trial were presented to the trial court by motion for a new trial, as shown in the transcript, and one of the contentions of the appellee is that appellant did not perfect her appeal to this court within the time prescribed by law. It urges that since the said errors of law were not argued before the court or discussed in appellant's brief the appeal should have been perfected within thirty days from the entry of the decree. But it appears that said motion for a new trial was overruled by the trial court on the 20th of April, 1933, and that the case was docketed in this court on the 18th of May, 1933. The appeal was therefore within thirty days and in due time. This is in accordance with the rule of the supreme court announced in *Lincoln Packing Co. v. Coe*, 120 Neb. 299, the language of the opinion being: "Where a motion for a new trial, alleging errors of law occurring at the trial, is interposed in a proceeding under the workmen's compensation act, the thirty days within which an appeal shall be perfected from the district to the supreme court commences to run on the overruling of the motion."

This being disposed of, it remains only to consider *de novo* whether the condition of Delmar Saxton is due wholly or in part to the accident alleged, it being without dispute that said accident occurred while Delmar was in the employ of the appellee and upon an errand in the course of his employment.

Delmar Saxton was a youth of about the age of nineteen or twenty at the time the accident occurred. He was driving a car and delivering a piece of pipe or something of the kind; his car collided with a truck; his car was overturned and he was thrown to the ground. But he was only slightly injured, receiving a sprained thumb and a scratch upon that member or upon his hand. From that injury the appellant insists that he became

afflicted with the disorder of schizophrenia or dementia præcox, or at least that such disorder was so aggravated or accelerated as to become active and render him a confirmed sufferer from schizophrenia, completely and permanently disabled.

The defense is that the accident bore no relation to his condition; that at the time of its occurrence he was subject to schizophrenia, had long suffered from it and had long been treated for it; and that such injury as he received from the accident in no degree excited it or accelerated it.

A great deal of time was consumed upon trial by testimony to the effect that the boy Delmar was a brilliant student in the high school and that his accomplishments there were many. However this may be, if he is to recover in this case it must be upon the ground that the accident was the cause of his disablement, or aggravated it. Otherwise his injury cannot be held compensable. Deplorable as it is that a boy of so much early promise has become the victim of schizophrenia, the rule must go further. The burden of proof is upon him, and in order to compel compensation from his employer he must prove by a preponderance of the evidence that there was a direct causal connection between his disorder and his automobile injury. Nor can such proof be made upon possibilities or even probabilities.

The evidence is exceptionally voluminous and the briefs exceedingly lengthy; and since under the comparatively new law the court is trying the case anew and making an independent finding upon the evidence an exhaustive study has been made of the whole record. Much time has been expended by the writer in reading the bill of exceptions and in comparing all of the evidence. The case is important, involving as it does the future of the boy, and should receive and has received full consideration at the hands of the court,—none the less because of the extraordinary zeal of appellant in her discussion of the evidence.

It is plain, we think, that schizophrenia or dementia præcox or the glandular deficiency described by some of the witnesses are very much alike. The terms were much used as interchangeable by the specialists on the stand. The court has no difficulty in arriving at the conclusion that for the purposes of this case all refer to the same thing, i.e., the condition from which young Saxton is now complaining.

Delmar Saxton, Mrs. Bessie E. Saxton, Dorothy May Saxton, Robert Saxton and Howard Saxton, all of the immediate family, testified in substance that Delmar was almost beside himself after the accident, wildly excitable, nervous, critical of his sister and rough of manner toward her, distraught in his appearance, slovenly in his dress, and abnormal in most of his actions. Some of them testified that he appeared fearful to an extreme degree and had delusions and hallucinations of a pronounced character. Some of these statements were sharply checked upon cross-examination as to dates and circumstances. It was shown unmistakably that for more than ten days immediately following the accident he worked with diligence and effectiveness for his employer. Nevertheless, the evidence of these witnesses plainly indicates that he was in a period of great stress for several days before January 18, 1931, when he was taken to the Bailey Sanatorium at Lincoln.

Neither Delmar, his father, his family nor anybody else included any reference to the accident in the history which they gave to Dr. Bailey at that time, nor was he informed of it till after the trial before the commissioner, long afterward.

Where a person has an accidental bodily injury, followed briefly by a severe and permanent mental disorder such as schizophrenia, and where he has at all times been mentally sound and healthy before, men might naturally conclude that such injury was the cause of such disorder; but if it were made known to them that he had had such disorder for several years before, with sharp attacks

down to the date of the accident, they would not be apt to so decide. And if in addition it were shown that the said bodily injury was not to the head, trunk or spinal column, but consisted of no more than a sprained thumb and a scratched hand, they could be expected to agree that the injury was not the cause of the condition and had no causal connection therewith. We think they would so find even without reference to the preponderance evidence rule which the law would impose upon the plaintiff.

The case of the defense is stronger than that presented by way of illustration above. The subject had displayed the symptoms of schizophrenia in 1926, 1927, 1928 and 1929. Dr. Young, his own witness, discloses in his testimony that he treated him in November of each of the last three years and that his history clearly indicated the presence of the disease in all of them. He had had his periods of diffidence and timidity, his periods of moroseness, his periods of extreme excitation and irritability, his periods of delusions, his periods of wild and unnatural laughter, his periods of fear, his periods of abnormal use of tobacco, his periods of unnatural and unhealthy practices, his periods of desire to commit suicide, his periods of belief that he was being imposed upon and was the object of attempt to do him ill, and, along with these, his periods of remission in which his conduct was practically as it should be. All indicated, in the opinion of all of the experts, that he was afflicted with schizophrenia. This is established beyond question by the evidence; no reasonable person could conclude to the contrary upon reading the record.

The father of the young man, himself a lawyer of standing at the bar, realized the capacity of his son in the high school and hoped that the boy would follow in his footsteps and become a member of his great profession. He accordingly made every effort to persuade him to go to law school. Delmar did indeed matriculate at Creighton College, but attended only two classes and then refused to continue. No doubt there was much sorrow

and possibly some words on that account. Soon afterward Delmar secretly withdrew his savings from the bank and disappeared, leaving a note declaring that none of his family would ever see him again. According to his own story, he felt that if he did not break away from his relatives and surroundings in Omaha he would not be able to refrain from suicide. He went to California, riding partly on the train and hitch-hiking the remainder of the way. For a time he was employed there by a drug firm and went along very well in that employment. But this did not last. The record discloses that he fell in with bad associates, indulged to a greater or less degree in homosexual relations with one of them, dropped into the notion of suicide again and was only prevented therefrom by arrest upon the beach. Subsequently one of his associates wired his parents, who were already advised that he was in California, stating that Delmar was in danger of committing suicide and asking for $150 that he might bring him home. His father sent him transportation through the Y. M. C. A. and Delmar returned by himself, arriving in good spirits. This was in the fall of 1927. After that for some months he seemed fairly content and worked comparatively steadily in a store which was conducted by his mother pending the settlement of an estate but even during that time he had trouble with an employee and was accustomed to remain unusually long in an outside toilet. This was also his habit during his later employment at the Sinclair plant, as remarked and testified to by a number of his fellow employees. And he was once admonished by the superintendent for so doing.

After the disposal of the store he returned to Omaha and sought employment. He was first given a position in the offices of the Union Pacific, where he either lacked experience or was unable to apply himself successfully to the duties demanded by his employment. Consequently he remained there but a week, and was again looking for a job. He obtained a job with the Sinclair Oil Company,

the appellee, going to work for that concern at its plant in December of 1928. It was there that he was said to have had one or more or several relapses or periods of unusual mental disturbance characteristic of schizophrenia and dementia præcox. Dr. Young, his own specialist and expert witness, diagnosed his trouble as this disease in 1927.

There seems to be no dispute among the experts that those afflicted with schizophrenia have recurring periods of stress and remission, ordinarily termed relapses and remissions. During relapses the afflicted commonly exhibits greatly increased excitement or depression, indulges in bizarre conduct and entertains delusions. Remissions occur between the relapses and are usually of much greater length in point of time. Dr. Royal, one of appellant's witnesses, says that no one can tell the particula. cause of this and that relapse, though he recognizes sexual difficulty and traumatic injury as responsible for some. It would probably suit the expert to say in any particular case, "I wish I knew." One of the experts for the appellant so testified in this case in speaking of the general rule. Dr. Bailey, a specialist of long experience in cases of the mind and also a witness for the appellant, said in answer to a hypothetical question, in substance, that he considered it possible that the injury was responsible for Delmar's condition, but never in a single instance did he say that he was convinced that such was the case. Several of his answers, and indeed the burden of his answers, were as follows: "Assuming those premises, which the history does not quite show, I would naturally be suspicious that it (referring to the accident) might have caused it." He had testified before, it having been made plain that neither Delmar nor his father nor the plaintiff nor any one else had made any mention of the accident at the time he was received at the sanatorium, in these words: "Well, the history does not seem to show, as I have it, that he was free from nervous conditions of marked type before that." Another of his answers

was: "I should be suspicious that he had had a shock which had disturbed an unstable nervous system." And again he said: "I would think it might be very possible that any shock would accentuate a condition which seems to be present to a greater or less extent under the history." And, finally, he said, under the questioning of deputy commissioner Dutton: "I think my answer would be the same as before; that I would feel the shock of the accident very probably had something to do with awakening the previous trouble and aggravated it." Furthermore, upon cross-examination, in answer to a hypothetical question describing Delmar's activities immediately following the accident and for a period of nearly twenty-four days after, he declared that he would not be willing to have an opinion definitely that the accident had nothing whatever to do with his ailment. As to the lighting up of schizophrenia by the shock of the accident, his answer was: "It is quite possible." He further said: "I would fear the result of any shock in such a condition." Dr. Royal testified in much the same manner, saying that it would be possible. Dr. Young testified that he was of the opinion that the accident as described might have had an aggravating or precipitating effect. The testimony of the experts for the appellant is full of "mights," "mays," "possible," and "fear." "Quite probable," "might be possible," and "very probable" recur again and again. Nowhere in the record is there stronger evidence on the part of the experts for the appellant, when the whole of it is compared and analyzed, than might be summarized in this expression: Very probably the injury caused the condition or aggravated, excited or accelerated it. On the other hand, all of the experts for the appellee were strongly of opinion to the contrary, and so testified, justifying their opinion by reasoning that was proof against cross-examination and convincing to the court. The court concludes that the preponderance of medical opinion was to the effect that the injury received in the accident had nothing to do with the disorder.

No recognition of the doctrine that because an injury may probably be the cause of an ailment the court should so find appears in our decisions. It may be so in other states, but not in this jurisdiction. The Nebraska rule, often pronounced and adhered to, is that in proceedings under the workmen's compensation law awards for compensation are not to be based upon possibilities or probabilities, but only upon sufficient evidence showing that the claimant has incurred a disability arising out of and in the course of his employment. *Bartlett v. Eaton,* 123 Neb. 599; *Townsend v. Loeffelbein,* 123 Neb. 791; *Kuhtnick v. Carey,* 124 Neb. 762. Going further, the rule is that the burden is upon the plaintiff to show with reasonable certainty that his or her ailment was caused by the injury sustained; and this proof must be made by substantial evidence leading either to the direct conclusion or to a legitimate inference that such is the fact. *Omaha & C. B. Street R. Co. v. Johnson,* 109 Neb. 526; *Bartlett v. Eaton,* 123 Neb. 599; *Townsend v. Loeffelbein,* 123 Neb. 791; *Mullen v. City of Hastings, ante,* p. 172.

Furthermore, the law by which this court must be guided in its independent finding and in its decision of this case is to the effect that in compensation cases the burden is upon the claimant to establish by a preponderance of the evidence that the alleged resulting disability is due to the injury complained of. *Pensick v. Boehm,* 124 Neb. 28; *Bartlett v. Eaton,* 123 Neb. 599, and cases hereinbefore cited.

Although our court has heretofore decided that mental disorder may result from trauma and may be lighted up, aggravated and set in motion by trauma, it has at no time declared or recognized in its opinions that such a disorder often occurs from such a cause. The fact, if it be a fact, has comparatively few instances to justify the view; so few that in any given case the probability may be properly indulged that trauma is not the cause of an ailment of the kind mentioned. By far the greater number of cases in which recovery has been permitted

in cases of dementia præcox or the like, alleged to have resulted from trauma, are cases in which the injury was to the head and had a direct physical connection with the brain. The reason seems to be that direct injury to the head may be severe enough to cause structural lesions of the brain thereby becoming the immediate cause of some form of insanity or mental weakness.

In the case at bar the evidence of the appellant is entirely insufficient to connect his dementia with the accident suffered; and though his disability may have happened from trauma or from sexual disturbance or from narcotics or from accident of birth, the court cannot say, as it must say if recovery is to be had, that it happened from any particular one or other of them. The evidence does not justify it.

In an Illinois case, *Standard Oil Co. v. Industrial Commission,* 322 Ill. 524, the court said: "The liability of an employer under the compensation act cannot be based on a choice between two views equally compatible with the evidence but must be based on facts established by evidence, and where the cause of injury or death is equally consistent with an accident and with no accident, compensation will be denied." Under this rule, which is far more favorable to a claimant than the Nebraska rule, no finding for the appellant can properly be made. Stripping the case of a great deal of unnecessary and immaterial matter and from the rancor of the battle extending almost to unwarranted disparagement of witnesses and parties and from sympathetic appeals which cannot be properly considered, and giving every material detail of the evidence its due weight and effect and impartially applying the law, it is impossible for the court to conclude that the accident in question was in any way responsible for Delmar Saxton's condition. We conclude that the appellant had long suffered from schizophrenia or dementia præcox before the accident which he sustained, and that the accident contributed nothing to its relapses, and that the trial court was correct in his findings and decree.

Finding as we do, the decision of the trial court must be upheld and its decree affirmed. It is so ordered.

AFFIRMED.

PAINE, J., dissenting.

I find it impossible to agree with the opinion rendered in this case by a majority of the court, and therefore file this dissent.

It is stated in the opinion that the disorder from which Delmar Saxton was suffering was in no way caused, precipitated, or aggravated by the injury which he received in his automobile accident; that the bodily injury he suffered from his accident was not to his head, trunk, or spinal column, but consisted of no more than a sprained thumb and a scratched hand. But let us remember that, in the trial of this same case before the compensation commissioner, he found that the plaintiff, while in the employ of the defendant, sustained personal injuries in an accident arising out of and in the course of his employment, by the wrecking of the automobile which he was driving, thereby causing great mental and nervous shock to the plaintiff, of such a nature and extent that his previous nervous and mental condition was accelerated, excited, and aggravated, thereby causing a complete nervous and mental breakdown to the plaintiff on January 15, 1931, and that, as a result of said accident, plaintiff has been totally disabled from and after the 15th day of January, 1931. It is a matter of common knowledge that many soldiers in the battles in the Argonne Forest suffered shell shocks which did not even scratch a thumb, and yet, from the shocks thus received, they will be disabled and live in sanatoriums all the remainder of their days. In one case an employee's back was broken, and the insurance carrier attempted to avoid an award for permanent incapacity of both legs on the ground that there was no actual injury to the feet or legs, but only to the spinal cord, although the lower limbs were paralyzed. *Burns' Case*, 218 Mass. 8.

In the main opinion, the answers of the experts, Dr.

Bailey, Dr. Royal and Dr. Young, are said to be filled with indefinite statements, as "mights," "mays," etc., and from this fact a conclusion is drawn that the shock received in Delmar Saxton's accident had nothing to do with his present insanity. Has the study of mental diseases reached that state of development in which a skilled expert of great experience can be expected to state absolutely and positively, when under oath, the exact degree of resulting insanity which was due to the shock of a serious accident? I do not so understand it.

And yet, let us examine just one answer of Dr. G. A. Young, who had been superintendent of both the Lincoln and Norfolk state hospitals for the insane. He is asked a hypothetical question, being No. 530, which recites all the facts proved by plaintiff, and is then asked to give his opinion. His answer is: "I *have* the opinion that the emotional shock of trauma which Delmar Saxton suffered December 6, 1930, had an aggravating or precipitating effect in bringing about this acute mental disturbance of the latter part of December and the middle of January." Is not that a positive, but conservative, answer of a careful expert who *knows,* but refrains from overstatement?

Mrs. Bessie E. Saxton, the mother of Delmar, testified that Delmar went to work for the Sinclair Refining Company in December, 1928, working continuously, without any vacation, until January 15, 1931, excepting once when he quit work because he did not receive a raise in salary, and was off work two or three days. During those three days he was at home, there was no change in his appearance, or no threats of suicide, or no evidence of nervousness or mental disturbance because of the refusal to increase his pay. She says he was never absent from his work for the Sinclair Refining Company on account of illness, physical, mental, or nervous. The accident occurred December 6, 1930, and he had to be taken to Green Gables Sanatorium, Lincoln, on January 18, 1931.

A study of the photographs taken shows how terrible the shock of the collision must have been. Delmar's light car was crushed against the curb, both wheels on that side were snapped off, and the automobile finally came to rest against a tree, upside down in a slanting position, resting on its top and hood, in which position the storage battery acid ran over Delmar, ruining his clothes. It seems incredible that he escaped being killed.

A workman received an injury in the course of and arising out of his employment, through a splash of molten lead into his eye September 17, 1913. He was treated at a hospital until October 13, 1913, when he threw himself from a window and was fatally injured. There was evidence tending to show that, although for a time after the injury the deceased was in his normal temperament, which was hopeful and joyous, he then became silent and moody, and was depressed, and suffered from certain kinds of hallucinations. The medical testimony was to the effect that probably there was developed from the accident a mental disturbance, accompanied by delusions and hallucinations, and that as a result he committed suicide. It was held that the evidence was sufficient to justify a finding that the insanity was incurred as a result of the accident received in the course of his employment, the court saying that, although the finding in this respect was supported by a rather slender thread of evidence, it was not unsupported, and therefore must stand.

To show how far some courts have gone, we find in this case that, in discussing the burden of proof, Chief Justice Rugg, of Massachusetts, said: "Of course this does not mean, as was said by Lord Loreburn in *Marshall v. Owners of Steamship Wild Rose* (1910) A. C. 486, 'that he must demonstrate his case. It only means that if there is no evidence in his favor upon which a reasonable man can act he will fail.' If the evidence, though slight, is yet sufficient to make a reasonable man conclude in his favor on the vital points, then his case is proved."

*Sponatski's Case*, 220 Mass. 526, L. R. A. 1916A, 333, 20 A. L. R. 59, note.

English courts have held that mental, nervous, or hysterical effects of an accident are included within the term "personal injury by accident arising out of and in the course of the employment" under the compensation act. *Yates v. South Kirkby, etc., Collieries, Ltd.,* (1910) 2 K. B. 538.

It has frequently been held that hysterical neurosis as a result of an injury entitles one to compensation, as in *Linser v. Consumers Ice & Coal Co.,* Mich. W. C. C. (1916) 61, and that insanity caused by accidental injury is a proper ground for compensation. *Hayes v. Standard Oil Co.,* 1 Cal. Ind. Acc. Com. 218; *Walsh's Case,* 227 Mass. 341. Nervousness following a fall from a scaffold was held compensable. *Coslett v. Shoemaker,* 38 N. J. Law Journal, 116; 1 Schneider, Workmen's Compensation Law (2d ed.) 610, 630, 639. When an employee suffered an accident to his arm which caused hysterical paralysis, it was ordered that compensation continue as long as it should last. *Ream v. Sutter Butte Canal Co.,* 2 Cal. Ind. Acc. Com. 187; *Guay v. Brown Co.,* 83 N. H. 392, 60 A. L. R. 1284.

Even though an accident may not produce an anatomical pathology, nevertheless if the workman does, in fact, become disabled as a result of that accident, the injury is compensable, although such disability may be the result of hysteria, and may be traceable to a mental condition and not a physical disorder. *Wilkinson v. Dubach Mill Co.,* 2 La. App. 249; *United States Fuel Co. v. Industrial Commission,* 313 Ill. 590; *Harris v. Castile Mining Co.,* 222 Mich. 709.

A woman, in an effort to avoid injury from a broken pulley flying from a machine, strained her left leg and fell against a machine, causing her to suffer from traumatic neurasthenia. It was held that, even though this disease exists only in the mind of the sufferer as a hysterical condition, she had no power to prevent this mental

condition, and is entitled to compensation for the results of the accidental injury. *Brewster v. Hemingway & Sons Soap Co.,* 2 Conn. Comp. Dec. 128; 1 Schneider, Workmen's Compensation Law (2d ed.) 610, sec. 205.

In *Skelly Oil Co. v. Gaugenbaugh,* 119 Neb. 698, it was held that "it is sufficient to show that the injury and preexisting disease combined to produce disability, and not necessary to prove that the injury accelerated or aggravated the disease, in order to satisfy the requirement of the statute that the accident arose out of the employment." Other Nebraska cases of interest are *Gilcrest Lumber Co. v. Rengler,* 109 Neb. 246, 28 A. L. R. 200; *Marler v. Grainger Bros.,* 123 Neb. 517; *Van Vleet v. Public Service Co.,* 111 Neb. 51; *Miller v. Central Coal & Coke Co.,* 123 Neb. 793; *Flesch v. Phillips Petroleum Co.,* 124 Neb. 1; *Watkins v. Brunswick Restaurant Co.,* 123 Neb. 212.

In the opinion of the writer of this dissent, the evidence shows that Delmar Saxton was not only a popular scholar, being elected president of his class in the eighth grade, but also a brilliant scholar in the Central high school at Omaha, with rarely a B upon his report card, and being one of those out of a class of 400 to be elected to the National Honor Society. He was editor-in-chief for two years of the high school paper, and wrote first-page articles while working for the World-Herald. He was somewhat nervous and high-strung, and, failing to get a job to his liking upon graduating from high school, hitch-hiked to California, as other boys have done, and there practiced some bad habits and showed evidence of minor mental disturbance. He returned to Omaha and settled down. He followed advice given him by Dr. Young, a leading psychiatrist, and conquered some of his weaknesses, and became a faithful, hard-working member of society at $75 a month for the Sinclair Refining Company. He performed exacting duties of a warehouse clerk, made deposits of their funds in their bank account, and as a stenographer got out reports and letters for

some two years. On December 6, 1930, an extension pipe had to be taken immediately to a customer's residence, for a tank was on the way out to make a delivery. This was not Delmar's job, but he not only volunteered to do the job, but volunteered to use his own car, as the two company cars were out of commission at the moment. The collision was without fault on his part, but the terrific shock of this accident overcame his mental balance, and aggravated his mental condition so that in a few weeks he became insane, and has since been confined in Green Gables Sanatorium.

His former employer has contested this case at every step of the road, bringing a former general agent from Fort Worth to testify, as well as the surgeon-in-chief of the company from Tulsa. The thick brief of 166 pages attests to the battle royal which has been waged to avoid the payment of compensation awarded by the commissioner in this case. All of these things are entirely proper, and within its legal rights, and appear to have brought victory and established a precedent which will be of great value to this far-reaching company.

The writer of this dissent believes that we have a case squarely in point in *Faulhaber v. Griswold*, 124 Neb. 357. There a Lincoln young lady received a bump on the head in an automobile collision. She suffered from shock and headaches, and in a few days showed mental disturbance, which grew at an alarming rate, and in a few weeks it was necessary to commit her to a state hospital for the insane, where she now remains. In this opinion Judge Good said: "The evidence on behalf of defendants is to the effect that plaintiff is suffering from dementia præcox; that it is an inherited disease, and that the injury, shock and fright did not cause or contribute to her condition. Medical testimony on behalf of the plaintiff tends to show that she might have gone through life without ever developing dementia præcox but for the injury, resulting in the shock and fright, and that, in

the opinion of such witness, the injury, shock and fright caused the development of the disease."

It was my understanding that in this case our court had established a precedent that the shock of an accident may cause or precipitate dementia præcox, and in my opinion the case at bar is a parallel case, clearly established by the evidence of well known experts in mental diseases called by the plaintiff, and warrants this court in reversing the lower court and in reestablishing the judgment for compensation awarded by the compensation commissioner, at the rate of $12 a week, beginning January 15, 1931, with attorney fees and other costs.