GOOCH MILLING & ELEVATOR COMPANY ET AL., APPELLEES, v. HARRY WARNER, APPELLANT.

FILED NOVEMBER 9, 1934. No. 29080.

*Le Roy G. Stohlman* and *George I. Craven,* for appellant.

*Hall, Cline & Williams, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY and PAINE, JJ., and REDICK, District Judge.

REDICK, District Judge.

Action for additional award under workmen's compensation act for total disability following an award and lump sum settlement for temporary total and partial disability resulting from an accident suffered by the employee arising out of and in the course of his employment. Notwithstanding the formal designation of the parties on appeal by the employer from an award by the compensation com-

missioner, for the purposes of convenience we will term the employee the plaintiff and the employer and insurance carrier defendants. On June 6, 1930, plaintiff was in the employ of the Gooch Milling & Elevator Company as a common laborer and was injured while employed in using a hand truck for the purpose of transporting a load of flour. Having placed a number of sacks of flour upon the truck while it was in a standing position, plaintiff took hold of the handles for the purpose of bringing the truck to a horizontal position that it might be pushed on its wheels to the place where it was to be unloaded. Plaintiff slipped, fell upon his back and the loaded truck fell upon him, in consequence of which he was injured. A prior injury had been suffered by plaintiff January 16, 1930, resulting in a fracture of a segment of the coccyx, of which a portion was removed by operation, and which resulted in a disability from which plaintiff fully recovered, and returned to his employment April 16, 1930, having received due compensation.

After the second accident X-rays were taken and examinations of plaintiff had by two physicians, members of the medical advisory board, and one at the request of the insurance carrier, and plaintiff was seen and treated or examined by four physicians and one X-ray expert an aggregate of some 40 or 50 times up to December 26, 1930. November 3, 1930, petition for compensation was filed with the commissioner, hearing had December 26, 1930, on which date plaintiff was again X-rayed, and on January 5, 1931, was examined by another member of the advisory board, and on January 23, 1931, an award of compensation was made by the commissioner for a permanent partial disability which had diminished his earning power 15 per cent., at the rate of $2.40 a week not exceeding 300 weeks. On appeal by the employer this award was confirmed, and on March 9, 1931, a lump settlement was made by consent of the parties whereby total compensation was commuted, and by order of the district court employer was finally discharged from any and all liability to plaintiff, Harry

Warner, on account of the accident of June 6, 1930, and proper releases and satisfaction of judgment were executed.

On March 20, 1933, the present or second petition for compensation was filed before the commissioner upon the alleged ground that at the time of the accident plaintiff had traumatic arthritis of the spine and pulmonary tuberculosis in a dormant state, of which plaintiff had no knowledge until after the settlement; that said diseases were latent and progressive and not discoverable by the exercise of reasonable diligence, and did not culminate in compensable disability until December 10, 1932; that on said date plaintiff became totally and permanently disabled, for which he has received no compensation, and that the settlement was made under a mutual mistake of fact. Hearing was had April 24, 1933, and on May 1, 1933, a second award of compensation was made by the commissioner at the rate of $15 a week from December 15, 1932, until plaintiff's temporary total disability shall end, but not to exceed 300 weeks from the date of the accident or until further ordered, and for necessary medical and hospital care. Upon appeal by the defendants to the district court this second award was set aside on the ground that plaintiff had not sustained the burden of proof, and the action was dismissed. Plaintiff appeals to this court.

The claim of the plaintiff is that the first award of compensation was for traumatic neurosis only. Plaintiff claims as the result of the accident he was afflicted with a disease which he terms "traumatic arthritis," or at the time of the accident plaintiff was suffering from the disease of atrophic arthritis, which was lighted up or fanned into activity by the accident and culminated in his total disability on December 10, 1932. Defendants deny that there is any such thing as traumatic arthritis, deny that plaintiff was suffering from atrophic arthritis at the time of the accident, and deny that such disease was lighted up or fanned into activity by the accident, and claim that if it were so lighted up the result would be but temporary and easily

discoverable within a few days or weeks of the time of the accident; that as a matter of fact it was discovered as early as September, 1931, that plaintiff was suffering from atrophic arthritis caused by infected tonsils, and that plaintiff's second application, not having been filed within one year from the discovery of that disease, the claim is barred by the statute of limitations. Defendant further claims that plaintiff's action is barred by the lump sum settlement of March 9, 1931.

Plaintiff's action is based upon the proposition that he was afflicted with the disease known as atrophic arthritis at the time of the accident, which fact was unknown to both of the parties, a disease of insidious onset and not discoverable or discernible before the date of the lump sum settlement, that was not taken into consideration at that time, and that such settlement was made under a mutual mistake of fact and therefore did not cover the total permanent disability from which plaintiff is now suffering.

The first question for our determination is whether or not, at the time of the accident, June 6, 1930, plaintiff was suffering from the disease known as atrophic arthritis. That such disease may not be *caused* by trauma is established by the overwhelming weight of the testimony of the doctors; in fact, that proposition may be looked upon as conceded. All of the expert witnesses agree that atrophic arthritis is an infectious disease caused by the presence of bacteria known as streptococci, in some portion of the soft tissues of the body, particularly the mucous membrane of the throat and associated organs, not discoverable by means of the X-ray until it has progressed to such an extent as to dislocate some portion of the bony structure, as the result of the destruction of the soft tissues in which the germ is present. There are, however, clinical evidences by which the presence of the disease may be discovered at an early period. The symptoms of the disease are stated by Dr. Clayton Andrews as follows:

"Recurrent pains in the various joints, from one to many joints, which are usually present in the mornings

and may only amount to a small amount of stiffness at the onset which disappears later in the day with the use of the joint. As the disease progresses there is more pain and the pain becomes more definite, there becomes more disability. There becomes more swelling. There show up more changes in the soft tissues. The patient becomes weak. He looks sick, that is, he is sallow. He usually has a poor appetite. He loses some weight. He fatigues easily. He has headaches. He runs a low grade leukocytosis, that is a slight increase in the white cells. He may carry a slight amount of fever. There is usually a rapid sedimentation test of the blood cells and then there are certain pathological changes in the joint tissues if removed and examined which, of course, are not found on examination. There is also muscle spasm, definite tenderness, limitation of motion of the affected joint and redness, puffiness and an atrophy of the joint muscles which is exaggerated in appearance because of the swelling of the joint itself."

None of these symptoms were present upon the numerous treatments and examinations of the patient by the doctors upon the 6th day of June, 1930, and September of that year. On the contrary, the examining physicians during that period testify that he had the appearance of a perfectly well man; that he was robust, of good color, and nothing demonstrable except a complaint of pain in his back, lower back, which, in fact, is the only complaint which plaintiff ever made, up to August or September, 1931, having a bearing upon the question of the existence of atrophic arthritis. It appears from the evidence that after the lump sum settlement Warner was able to do heavy work for about three weeks in aiding his cousin in the digging of a cesspool during which he handled the windlass and shoveled dirt into a truck and unloaded the same; that after that he engaged in selling Haller's products, which job he quit because there was not anything in it for him, and in September, 1931, he started to learn the shoe repair business and finished in January,

1932, and that he did no business in that vocation until May, 1932, as he did not have the funds to get started; that his back was hurting him at the time, and that he then opened up and ran his shop continuously until December, 1932. He says he was able to do the cesspool work "with very little pain or disturbance; my back bothered me some but I was able to go ahead and work;" that the pain in his back reached the point where it was most severe December 10, 1932, and since that time has been getting worse.

During all this time he was wearing either a plaster cast from the arm pits to the hips or a brace applied for the purpose of relieving pain in the back of which he complained. In August, 1931, plaintiff consulted Dr. Orr, but the real examination was made by Dr. Teal who saw him for the first time.

Dr. Teal was called and testified for the plaintiff regarding an examination made by him August 6, 1931, consisting chiefly of an inspection of the X-ray plate taken by Dr. Smith on that date and a physical examination consisting of "an inspection of his back and testing him out with various motions of the spine and palpation of the spine and muscles of the spine for muscle spasm tenderness." He testified that he found a visible deformity of the spine and a backward angulation, considerable muscle spasm and limitation of motion because of pain, and that in his opinion these abnormalities had existed for one or two years. He further testified that he made a diagnosis of atrophic arthritis and that he had had it one or two years, but this opinion was not given expression in the evidence until after a second examination of plaintiff by Dr. Teal in May, 1933, after four additional X-rays had been taken by Dr. Smith at which time the existence of atrophic arthritis is conceded by all. Witness gave his opinion that it was possible for him to have had it before the injury, but did not state that at the date of his first examination he was of opinion that such arthritis existed at the time of the accident. He further testified that he

had examined the X-ray taken by Dr. Rowe on May 17, 1933, and that there had been no change since the previous X-rays, and at the time of the trial that in his opinion the accident of June 6, 1930, was the exciting cause of plaintiff's condition. This witness does not claim to have relied upon any clinical findings, present upon his first examination, as indications of the disease except the muscle spasm and stiffness.

Dr. J. E. M. Thomson for plaintiff testified in answer to the question whether or not the accident of June 6, 1930, is the proximate cause of the disability which Mr. Warner now suffers:

"Taking into consideration the history and the ultimate outcome of the case, one would have to assume that at least the injury was a contributing factor." And he further testified: "Q. Assuming that this arthritic condition might have been present at the time of this accident but in a latent form such that it was unknown to Mr. Warner, in your opinion would the accident which he described to you as occurring on June 6, 1930, together with subsequent history and developments, would that accident, in your opinion, acutely aggravate the condition which would be present, which was present? A. It *could* have been the cause. Q. That is, of course, assuming that it was present before in a latent form? A. Yes, sir. Q. What effect does trauma ordinarily have on a patient suffering from arthritis? A. Always aggravates it. Q. What effect does trauma ordinarily have in cases where a patient is suffering from atrophic arthritis? A. It may influence it and may not. Now in cases of atrophic arthritis, ordinarily trauma is more likely to aggravate the osteoarthritic type of which he shows slight evidence. Q. But it is entirely possible to aggravate also an atrophic arthritis, is it? A. Oh, yes. Q. Do you have an opinion as to whether or not in this particular case the trauma which this man suffered on June 6 did influence, aggravate or initiate or bring into being any one of those things, the atrophic arthritis of which he now suffers? A. Yes, sir. Q. What is

that opinion? A. That very likely—the accident very likely influenced the arthritis or the aggravation of it, symptoms of it. Q. In your opinion is it probable that that is the thing which has occurred in this case? A. Yes, sir."

He further testified that in his opinion the plaintiff had atrophic arthritis at least as far back as March 9, 1931; that the disease was infectious, but might be aggravated by injury; that it is slow in development, but that objective symptoms always appear before the existence of the disease will be shown by X-rays. Dr. Thomson's examination was made September 26, 1932. He did not write down any notes of the history given him at that time and could not remember it but relied partially on notes given him by the attorneys.

Dr. Rowe did not examine the plaintiff until May, 1933, at which time it is conceded that the plaintiff was permanently disabled by reason of the existence of atrophic arthritis. He testifies that in his opinion the plaintiff had that disease for a number of years and that the injury lit it up; that, when any one who is suffering from atrophic arthritis receives an injury, the disease becomes rapidly worse; that the disease must have existed prior to the injury or at least prior to the first part of 1931, giving as his reason that disease always precedes pain (plaintiff testifies that he had no pain in his back prior to the accident); that they ordinarily have pain in the back, muscle soreness and stiffness; that objective symptoms practically always appear before an X-ray will give evidence of the disease. He further testified that "the injury simply stirred up the trouble which was slumbering in his back and his present condition is the result of injury on top of chronic arthritis which he had at that time;" "that the disease must have existed prior to the injury, at least prior to the first part of 1931, because the disease always precedes the pain and rigidity."

On the other hand, the defendant produced five or six witnesses who testify positively that the disease of

atrophic arthritis is of essentially infectious origin, principally by the presence of bacteria known as streptococcus; that, while in the early stages of the disease the X-ray is of no value diagnostically, clinical evidence is always present in the early stages and can be found; that there is no connection between the injury of June 6, 1930, and the present condition of plaintiff; that, if an existing atrophic arthritis could be affected by trauma, its effect would be localized at the point of infection, would be only temporary and would shortly disappear; that, if the disease existed at the time of the accident and was lighted up thereby, positive evidence of the disease would have appeared in September and October, 1930, when plaintiff was thoroughly examined by several doctors, and that no symptoms of the disease were discovered at that time.

Dr. Teal did not examine plaintiff until August, 1931; had been a practicing physician since 1930; said that it was *possible* for him to have had atrophic arthritis before the injury; and, while he stated that in his opinion the accident was the exciting cause of plaintiff's condition, such conclusion is based upon the mere possibility previously declared.

Dr. Thomson did not examine plaintiff until September, 1932, when there was definite pathology of steptococci infection of the tonsils, and his opinion is based upon an assumption that the injury was a contributing factor, and that pain existed prior to the accident, while plaintiff testified positively that he never had any pain prior to that time. He also said that trauma *"could be"* the cause of atrophic arthritis, contrary to the overwhelming weight of the evidence; also that "very likely" the accident influenced the arthritis; and upon the length of time the disease had existed he qualified his evidence by the statement that in his opinion "plaintiff had atrophic arthritis at least as far back as March 9, 1931."

Dr. Rowe did not examine plaintiff until May, 1933, and bases his opinion that plaintiff's present condition is the result of injury on top of chronic arthritis which he had

at that time or which must have existed at that time, at least prior to the first part of 1931, because disease always precedes the pain and rigidity. The evidence does not show the existence of pain and rigidity at time of the accident, but the contrary.

This evidence is largely speculative, based upon assumption and faulty premises, and when weighed against the evidence for defendants is far from convincing. We think the language of Judge Shepherd in *Saxton v. Sinclair Refining Co.*, 125 Neb. 468, is quite largely applicable here: "The testimony of the experts * * * is full of 'mights,' 'mays,' 'possible,' and 'fear.' 'Quite probable,' 'might be possible,' and 'very probable' recur again and again." But in addition to that it cannot be said to be even probable that the disease existed at the time of the accident, where no pain or other evidence was present.

The record is quite voluminous and we do not feel justified in quoting from it more extensively than we have done, although it has been read and studied with great care, and we have arrived at the conclusion that the testimony offered by the plaintiff is not of that positive and convincing character which would justify a finding that the plaintiff was afflicted with atrophic arthritis at the time of his accident in June, 1930. It would seem beyond argument that, if it had so existed, and plaintiff having been under repeated examinations and treatments, some evidence of that fact would have developed before August, 1931, over a year after the accident. Beyond this, no examination of plaintiff prior to October, 1931, showed any evidence of infection in the tonsils, throat or other parts of the body where such infection would be expected to be found if it existed. In October, 1931, for the first time, the stubs of plaintiff's tonsils, they having been formerly partially removed, were found to be infected with streptococci, and from that time forward the disease grew rapidly worse until December 10, 1932, when the plaintiff had become totally disabled. In the meantime plaintiff pursued several avocations.

It is the settled law of this state that the burden of proof is upon the claimant "to show with reasonable certainty that his or her ailment was caused by the injury sustained; and this proof must be made by substantial evidence leading either to the direct conclusion or to a legitimate inference that such is the fact." *Saxton v. Sinclair Refining Co.*, 125 Neb. 468.

The evidence for plaintiff is far from convincing under that rule and when considered with that of the defendants' witnesses fails to sustain the burden of proof required.

The qualifications of the experts called for the defendants are not attacked except by criticisms, oft repeated, on that ground alone; but in weighing expert testimony offered by both sides we prefer to assume that these professional gentlemen have given their testimony and opinions honestly and with proper respect for their own dignity and that of the profession to which they belong.

We conclude that the evidence for the plaintiff is not sufficient to sustain the burden of proof as to the existence of the disease of atrophic arthritis in the plaintiff at the time of the accident in June, 1930, and therefore it will be unnecessary to discuss the other questions presented by the briefs, such as whether or not the disease could be lighted up by the accident or the question of the statute of limitations.

Judgment of the district court is correct and is

AFFIRMED.