FRANK SVOBODA, APPELLEE, V. GABRIELA MANDLER, APPELLANT.

275 N. W. 599

FILED OCTOBER 29, 1937. No. 30143.

*Anson H. Bigelow,* for appellant.

*Votava, McGroarty & Sklenicka, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ., and CHAPPELL, District Judge.

PAINE, J.

This is an appeal from a disallowance by the trial court of a claim for compensation made by the widow of a deceased workman.

A hearing was first had in May, 1935, before Stephen Vail, deputy labor commissioner, of Omaha, who dismissed the claim, and then a hearing was had before Lawrence Welch, one member of the compensation court, in June, 1936, and the claim was again denied. An appeal was then taken and a hearing was had before the three members of the compensation court, and claim was allowed at $15 a week for 350 weeks, together with an allowance of funeral benefits, medicine, drugs, autopsy, and the claims of a number of doctors, the whole allowance amounting to more than $5,600.

From this award of the compensation court, appeal was taken to the district court, and after a trial in that court a decree was entered, and the award of the compensation court was vacated, and the claim was dismissed.

The evidence discloses that Michael Mandler, deceased, sailed from Hamburg to the United States in December, 1923, and in 1926 entered the employ of the defendant, Frank Svoboda, manufacturer of monuments at Omaha, and for about a year and a half did general work in repairing machinery, setting monuments, helping about the yard, and then started work as a sand-blaster, which occupation he continued for about six years, losing very little time from his work except for an attack of pneumonia and nose bleed in 1932.

In sand-blasting in the defendant's plant, the side of the monument to be carved is covered with hot glue, and the letters or designs to be carved are then outlined upon this coating of glue, and with a sharp knife the glue is then cut through and pulled away, exposing the bare granite or marble where it is desired to be cut away. The monument is then placed in one small room, and the sand-blaster takes his station in another small room, separated with a wooden partition except for a portion of the wall directly in front of the monument, where the partition is replaced by a screen and rubber, permitting the sand-blaster to move his arms in all directions, while holding a heavy hose, ending in a metal jet, through which fine, sharp

silica sand is blown under a pressure of about 100 pounds to the square inch against all the portions of the monument which are to be cut away by the sand-blast. The sand-blast makes no impression upon that part of the monument protected with the thick coating of glue, but eats away the surface of the hard stone which is exposed where the glue has been cut away with a sharp knife. The room in which the monument is placed is filled with dust of this sharp sand rebounding from the monument, and it is impossible to prevent some of this dust from coming through the opening through which the sand-blaster works with his hands and directs the jet of sand at the monument.

The defendant testified that he had given positive orders that the sand-blaster must wear a mask while at this work, and had provided a number of kinds of masks, but Mr. Mandler (whose habit it was to smoke a pipe almost continuously during the working hours) would repeatedly take off the mask, against orders, and in hot weather often refused to wear it, as he said he could not breathe.

A number of medical experts testified in this case, some upon each side, and while they differed in some of the details, yet the principal facts relating to Mr. Mandler's increasing disability, and the resulting death, were about as follows:

When he wore a properly-fitting mask of approved design, scarcely any dust could get into his nose. When he breathed through his nose, if any of the fine particles of dust were in the air they would be trapped in the passages through the nose, and practically no particles of dust would reach the lungs. The particles of sand lodging in the passages of the nose on the mucous membrane are at first taken care of by nature, by coughing out, and by the lymphatics. As time goes on, increasing deposits of dust lodged in the nose caused catarrh, the inflammation of which thickens the passages of the nose, making a person resort to occasional mouth breathing to get sufficient air.

When a sand-blaster discards the mask and breathes through his mouth, there is no protection by nature to

trap the dust particles, many of which lodge in the cells of the lungs. Some particles can be coughed out, but an increasing number remain, and this silica dust remaining in the cells of the lungs brings about a disease known as silicosis, and this causes miliary tuberculosis, which usually runs for six months to a year, which it did in this case, and finally death resulted from complications on September 13, 1934. The experts testified that silicosis, or stonecutter's disease, usually resulted in death in from five years to fifteen years, depending upon whether they worked outdoors or in a closed room, whether they wore masks, and depending somewhat upon the constitution of each individual, some resisting the onslaught of the disease much longer than others.

Silicosis is a definite occupational disease of the lungs, caused by breathing in air containing sharp particles of dust which lodge in the lungs. It follows a definite course, with a period of onslaught, then increasing severity in which the normal lung tissue is gradually replaced by fibrous or scar tissue over each particle of dust lodged in the lung, and miliary tuberculosis usually ensues, together with other complications, before death occurs.

The general term of this disease, covering both metallic and mineral particles, is pneumoconiosis, which is acute in metal mining, quarrying, drilling, tunneling, smelting, foundries, potteries, glassworks, as well as in stone, marble, and granite manufacturing, especially in sand-blasting. The United States department of labor, in a report published in April, 1937, states that 900,000 laborers are exposed to the disease; 105,000 of them have incipient pneumoconiosis, without tuberculosis, while there are between 4,000 and 5,000 workers who are disabled by the disease, with tuberculosis complications.

In section 48-152, Comp. St. 1929, the terms used in the Nebraska workmen's compensation law are defined, and one statement reads: "The said terms shall in no case be construed to include occupational disease in any form, or any contagious or infectious disease contracted during the

course of employment, or death due to natural causes, but occurring while the workman is at work."

The plaintiff in this case alleges that the death of Michael Mandler was caused by two accidents, the first when the nozzle came off the hose in May, 1932, and, second, in September, 1933, by the breaking of a hose while sand-blasting, and sand was forced into his nose, and alleges that such accidents were the proximate cause of his death, and this court has carefully examined all of the evidence relating to the two accidents alleged, and will briefly set out the same.

The defendant, on September 12, 1934, filed a written report, exhibit No. 3, with his insurance carrier, showing that Michael Mandler had been employed by him about eight years; that he drew wages of $26 a week; that he was not injured and had had no accident, and that on April 14, 1934, he became ill and said the "sand got him," and defendant states that he had tuberculosis; that a mask had been provided, but was not used except when defendant was present and insisted on it; that the sand-blasting room had a door that could be kept open for ventilation, and that there was also a suction to draw the dust out of the sand-blasting room, and says definitely, "Mandler never had an accident while working for us," and this report was signed by both the defendant and his wife.

At a hearing held nearly two years later before the compensation court in 1936, the defendant was called as a witness by the plaintiff, and on direct examination in response to questions about the alleged accidents stated that, when the nozzle comes off from the sand-blasting hose, it makes a terrible noise, and he was sitting in his office one day in May, 1932, and heard this noise and ran to the sand-blasting room, and that Mandler was there, trying to disconnect the hose, and the end of the hose was going like a snake wiggling his tail; that the room was full of dust; that Mandler had it all over his face, and his hand was hurt, but that the defendant did not see any cuts on his face, and he told him to wash up and go home, but

Mandler did not go home. The evidence also discloses that he worked the next day, and that he did not lose any time from his work because of this happening in 1932. It is also claimed by the plaintiff that in September of 1933 the hose broke, but that he did not lose any time on account of it. William Huebener, an employee, testified, as to this second alleged accident, that he remembered when it broke, but did not go and look; that Mandler just came out and said the hose broke, and he had to have a new hose, "so I got the new hose," and "that is all I know."

In response to further questioning, he said: "I can't remember whether it was 1930 or 1931. I am there so many years, and so many fellows change, I can't remember the dates."

The widow and the daughter of decedent testify to his telling them about having trouble with the nozzle and his nose bleeding.

George Svoboda, son of defendant, said Mandler came out and said it blew off, and they replaced the hose for him. The nearest he can come to fixing the date is that he thinks it must have been in the fall before witness started to work.

Dr. Frank J. Mnuk, the family physician, testified, as to the first accident, that he was called to the home and found what appeared to be a chest cold, he had an abrasion in his nose one-quarter to three-eighths inch long, and a chronic sinus condition, and chronic nasal catarrh; that Mr. Mandler said he had an affair down at the shop where he worked, where a nozzle came off the hose, and following that he began to feel a little worse until he developed a cold and a post-nasal drip.

In a report two days before death, signed by the attending physician, and made to the insurance carrier, being defendant's exhibit No. 1, he described the condition as follows: "Man has acute tuberculosis, which he claims is the result of inhalation of dust while sand-blasting in room without ventilation or mask."

The written report of the autopsy, made by Dr. Sven

Isacson for Dr. W. J. Egan, attending physician, at paragraph No. 11, reads as follows: "The condition here pictured is one of a very extensive Pneumoconiosis or so-called, Stone-mason's Lung, or Silicosis, which has led to a chronic Interstitial Pneumonia, invasion of lymph nodes, miliary tuberculosis and death." This is the typical history of this occupational disease.

Dr. Harold E. Eggers, pathologist, University of Nebraska, Dr. Claude T. Uren, nose and throat specialist, and Dr. E. L. MacQuiddy each testified that in his opinion the alleged accident did not cause, aggravate, or combine with the silicosis to hasten or bring about the death of Michael Mandler.

It may be admitted that, "Where an accident accelerates a disease, and produces disability, and the disease would not have developed without the accidental injury, that must be regarded as the contributory proximate cause." 71 C. J. 605.

But the evidence relating to the two alleged accidents in the case at bar is not convincing. The employer, in his written statement before employee died, definitely states there were no accidents, but some two years later, when called to testify for the plaintiff, recounts two minor incidents of a breaking of a nozzle and also a hose. Neither incident caused employee to lose any time. The increased dust in the room doubtless caused him to breathe more of it into his nose, but the evidence fails to show any permanent disability following either of the alleged accidents.

It appears to be settled in law that, to warrant a recovery for death by accident, it must be of such a character as to be the immediate and proximate cause of death or disability, and, further, be an accident for which the law authorizes compensation. *Rushonosky v. Lehigh Valley Coal Co.*, 293 Pa. St. 150, 141 Atl. 851; *Keith v. Narragansett Electric Co.*, 53 R. I. 160, 164 Atl. 907; 71 C. J. 605; *Bartlett v. Eaton*, 123 Neb. 599, 243 N. W. 772; *Metropolitan Dining Room v. Jensen*, 126 Neb. 765, 254 N. W. 405.

In the case at bar, it is not shown that the alleged minor

accidents accelerated, or aggravated, or changed in any way the slow, steady progress of an occupational disease. This has been well described as "drop by drop," little by little, day after day, for weeks and months in *Adams v. Acme White Lead & Color Works*, 182 Mich. 157, 148 N. W. 485, L. R. A. 1916A, 283, Ann. Cas. 1916D, 689.

Cases are cited to us from states in which the compensation law is entirely different from that in Nebraska, and allows recovery for death from injuries (not accidents), and for occupational diseases, such as that of *Sullivan Mining Co. v. Aschenbach*, 33 Fed. (2d) 1, in which case a painter became totally disabled in the course of a week from inhaling gas from poisonous carbon disulphide, used as a thinner, and it was held that under the workmen's compensation law of Idaho this was an injury, and not an occupational disease. Also, *Minns' Case*, 286 Mass. 459, 190 N. E. 843; *Schaefer & Co. v. Industrial Commission*, 220 Wis. 289, 265 N. W. 390; *North End Foundry Co. v. Industrial Commission*, 217 Wis. 363, 258 N. W. 439.

We have given a careful study to all of the evidence in the bill of exceptions, and especially the evidence of the medical experts, and we are satisfied that the breaking of the jet at the end of the hose, and later the breaking of the hose itself, were but trivial incidents in the everyday work, and in no way affected the progress of the occupational disease, silicosis, from which he was then suffering, and from which he died months later. The judgment of the trial court is therefore

AFFIRMED.