CHARLES LOWDER, APPELLEE, V. STANDARD AUTO PARTS COMPANY, INC., APPELLANT.

287 N. W. 211

FILED JULY 21, 1939. No. 30586.

*Chambers, Holland & Locke,* for appellant.

*Wayne L. Landon, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

The plaintiff was granted an award by the compensation court in the original hearing, and on rehearing the court, sitting *en banc,* granted him an award for temporary disability, medical and hospital fees. The defendant appealed to the district court for Lancaster county, where its appeal was dismissed, the court finding from the record competent evidence to support the award, and from such order of dismissal defendant appeals to this court, where the case is tried *de novo.*

The principal errors relied upon for reversal are: (1) That the award of the compensation court is based upon speculation and conjecture and not sustained by any evidence with reasonable certainty; (2) that the evidence clearly preponderates against the claim of the plaintiff.

The plaintiff, 46 years of age, a metal cleaner employed by defendant, on the evening of July 30, 1937, between 5 and 6 o'clock, pursuant to an order given by defendant's agents, started to replace a spring in a Model "A" Ford automobile. The car was jacked up, with the front wheels sitting upon two crank case pans. The motor was loose from the frame of the front end of the car. The tires were resting upon two oil cans. The plaintiff had to raise the front of the motor in order to get the front spring out, took hold of the jack and started to raise the front end a little higher; the car slipped off the pans and off the jack and struck the plaintiff on the right shoulder, bending him over to the left on the cement floor. At the time, he was in front of the radiator, his head being between the radiator and the bumper, with his left leg under him and his right leg straight out. After the accident the plaintiff was unable to tell his exact position. He stated that he got out from under the

car, but could not straighten up; that it was hard for him to get his breath; that he had shooting pains in his chest and in the upper and lower part of his left side; that he went to the office and related to his employer what had occurred and was immediately sent to the office of Doctor Hilton, who taped his lower left side and across his chest, gave him some medicine and some liniment to be applied, told him to go home and rest, and treatments were continued by application of heat from electric rays. On September 26, 1937, Doctor Hilton told plaintiff that he had done all he could for him and advised him to go to a hospital, presumably on account of tuberculosis. However, there is no testimony of Doctor Hilton in regard to any such statement. Plaintiff next consulted Dr. Czar Johnson, who immediately referred him to Dr. Arthur L. Smith, who has since treated him continuously.

The disability complained of, as reflected by plaintiff's petition in the compensation court, follows: After describing the nature of the accident, the petition alleges that the accident caused a severe contusion of plaintiff's left shoulder and left chest wall; fractured his left fifth rib, separated his right and left second rib from the sternum, producing a severe strain of the back, aggravating a pneumonitis, producing an active tuberculosis of the lungs, and aggravating a latent arthritis of the vertebræ. Defendant's answer is that the plaintiff's present disability was in no way caused by injuries sustained by the accident occurring July 30, 1937, but charges that his condition was caused by disabilities existing long prior thereto.

The record discloses that the plaintiff had claimed service-connected disability by virtue of his service in the World War, and had, since 1918, been confined in different hospitals from a period of a few days to five months at a time; and, on occasions, was placed under observation, to determine whether or not he had pulmonary tuberculosis, for which compensation might be awarded by the federal government, but on each occasion the conclusion was contrary to his claim that he had tuberculosis. His condition, as far

as the government is concerned in awarding him compensation based upon a 45 *per centum* disability, has been diagnosed as moderate chronic bronchitis and neurasthenia. The plaintiff on various occasions had exhibited the symptoms of pulmonary tuberculosis.

The plaintiff claimed to be in good health two years prior to the accident; that he was off work from his present occupation a part of a day on account of illness. This claim is disputed by the testimony of his employer, who stated, in substance, that plaintiff had told him he was not physically able to do the kind of work that he was then doing; he coughed a great deal, and for convenience a place was fixed for him to work, to enable him to be out of doors a portion of the time. He had stopped work on numerous occasions, on account of illness, at various times of the day and had gone home. Previous to the employment with defendant, plaintiff had worked at intervals at different places, as shown by the record, but had not done much work, due, perhaps, to his physical condition and hospitalization. Plaintiff claimed that he carried a basket of metal to weigh in just prior to the accident. His employer stated that after the accident plaintiff carried the basket of metal, weighing 90 pounds, 90 feet, to be weighed in.

A summary of the medical testimony received in plaintiff's behalf follows: Dr. Arthur L. Smith, the attending physician, testified that he had made 17 physical examinations of the plaintiff, had taken 13 X-ray pictures, had made 114 hospital calls, had attended the plaintiff for a period of five months and had taken tuberculin and sputum tests. His history of the case showed a bubo opened in 1909, tonsillotomy, appendectomy, and herniotomy in 1924, and right thumb removed in 1930. The tuberculin test resulted in a positive tubercular reaction upon a concentrated dilution of tuberculin, .005 milligrams; the reaction to the ordinary test, .002 milligrams, was negative.

At this point it is proper to state that, as a general rule, an arrested tuberculosis will show a positive tuberculin test in the ordinary dilution, for the reason that generally

there is a slight sensitivity to it, and therefore a concentrated dose of tuberculin is not ordinarily required, under such circumstances, to bring a positive reaction.

Doctor Smith found fractures of three ribs, which, however, were not discovered by him until after the first hearing in the compensation court. This fact is significant, considering the physical examinations and calls made by the doctor, and, further, that Doctor Hilton treated plaintiff from July 30, 1937, to September 26, 1937, and the evidence contains no statement by him of fractured ribs. Doctor Smith also found evidence of tubercular trouble, such as old hardened lesions, manifested by deposits of calcium in various parts of the lungs, and concluded that plaintiff had a fracture of three ribs on the right side, an aggravation of arthritis in the fifth dorsal vertebra, a separation of the second left and right costo-cartilages from the sternum margin, and an activation of an old tubercular condition, all of such conditions the result of the trauma suffered in the accident of July 30, 1937.

There also appears in the evidence a signed statement by Dr. Roscoe L. Smith, dated April 29, 1929, that the plaintiff had a chronic fibroid tuberculosis, as well as a signed statement of Dr. Miles J. Breuer, dated January 5, 1930, under the heading, "Present Illness:" "Comparison of present condition with condition ten years ago; cannot work now, could not work then; is more nervous, has more pains in the chest," and Doctor Breuer's diagnosis was: "Chronic low-grade tuberculosis with severe allergic manifestations and no extensive pathological changes." A statement in the record by Dr. L. J. Owen follows: "I diagnosed him as having tuberculosis;" the activity was "in the right upper lung." This was in 1932, and the records of the city clinic show that there was an active pulmonary tuberculosis on December 19, 1932. Doctor Owen testified that in March, 1937, in examining an X-ray picture taken at the city health department under his direction and control, there was no evidence of active tuberculosis, that the apexes were clear so far as the ordinary signs of activity are concerned; that,

if there is any evidence of any tubercular condition ever having been in the chest, it was at that time in an arrested stage. Dr. Allan Campbell, in speaking of the X-ray pictures of March, 1937, testified: "Left apex clear, right apex shows fibrous hilar shadows, * * * suggests complete arrest of activity;" "denies any signs of activity." Dr. Czar Johnson, witness for the plaintiff, did not pose as an expert in diagnosing tuberculosis, and left the matter to the judgment of Dr. Arthur L. Smith. Dr. Carl Kail did not testify, but a written statement signed by him (exhibit 15), in reference to the chest, relates that there was some evidence of "old tuberculosis infection."

Contra to the foregoing testimony, Dr. L. J. Owen, who took certain X-ray pictures in February, 1938, and wrote reports thereon, testified that he found no evidence of a tubercular condition activated by the accident of July 30, 1937, and no apparent change from the previous condition of the plaintiff. Drs. John C. Thompson, Clayton Andrews and W. W. Carveth made an extensive and complete examination of the plaintiff on February 28, 1938, and obtained a complete history of the plaintiff, who gave the same reluctantly. The blood pressure of the plaintiff was taken during the time he was being questioned and was found to be in an aggravated state for a man of his age, so much so that the examining physicians each took his blood pressure, and within a period of a few moments, when the questioning ceased, the blood pressure had dropped to 118. Considering the blood-pressure tests, as given, together with the history recited by the plaintiff and the examination made by the doctors, the examining physicians concluded that the plaintiff was not sincere in his claim. The doctors first gave him a test to determine what injury, if any, was sustained in plaintiff's back. He reacted favorably to the test, which indicated to the doctors clearly that he had no back injury that was a result of the accident. They found no evidence of fracture of the ribs and nothing upon which a finding that plaintiff's ribs were fractured can be based. They did find an indication of childhood tuberculosis, which

had not been active for a long period of time, a complete absence of adult tuberculosis, and no cavities in the lungs indicative of adult tuberculosis; that the breath sounds were not feeble but loud over the area supposedly involved. The plaintiff had gained in weight. Had there been activity he would, ordinarily, have lost weight.

The foregoing medical testimony substantiates the diagnosis made by the government doctors in reference to the disability for which plaintiff receives compensation. Doctor Carveth had previously examined the plaintiff and treated him in 1929, 1931 and 1932. He testified that plaintiff did not suffer any disability in the chest or any place in his body as the result of the accident. He thought in 1929 that plaintiff might have tuberculosis, but that it cleared up quickly, and he now knows that plaintiff did not have it.

Dr. Allan Campbell testified that the records of the city clinic showed that there was no evidence of any tuberculin test performed by them in March, 1937; that there was a blood test made and an X-ray picture taken, and that he had never made a tuberculin test of the plaintiff personally. Doctor Smith testified that he relied upon the tuberculin test performed by the city clinic, in fact by Doctor Campbell personally, and that he saw it in the report. He testified he was present and supervised the taking of the X-ray pictures at St. Elizabeth Hospital on February 14, 1938, and that Doctor Owen was not present. We have the testimony of Doctor Owen that he was present, took the X-ray pictures, and that Doctor Smith was not present. The record is void of evidence that tubercular bacilli were ever found in the sputum by any examining physician. The plaintiff testified to coughing up blood and pus on numerous occasions. He is the only witness so testifying. He states that his wife is the only other person who has seen him cough up blood and pus. However, she did not testify.

The record further shows that plaintiff's last attending physician, who diagnosed his case as active tuberculosis, which was lighted up by the accident, did not give the plaintiff medicine for such disease from September 26 until No-

vember 12, when he entered St. Elizabeth Hospital. The same physician testified that he obtained a history from the plaintiff which assisted him in his diagnosis. He took the plaintiff's general statement as to hospitals in which he had been treated and been under observation, accepted Doctor Breuer's statement, appearing in the record, and relied upon it extensively. He inferred that the history, or the number of hospitals the plaintiff had been in previously, would make no difference. Then the plaintiff, himself, testified that during the period of time that he worked for the defendant he walked 16 blocks each way to and from work and walked a mile or so each evening after work, attended parties and danced. His previous physical condition, the testimony of his employer as to conditions under which he worked, and the complaints made by him certainly disclose a conflict and inconsistency in the plaintiff's testimony and the testimony offered in his behalf. Plaintiff had been examined by Dr. Charles Arnold and Doctor Breuer in reference to his chest condition, and also by Dr. H. H. Johnson. However, plaintiff did not see fit to call any one of these three physicians. Many other discrepancies and inconsistencies are disclosed by the record.

From an examination of the entire record, the great weight of the evidence is that there was no activation of an arrested pulmonary tuberculosis as a result of the accident, and the evidence fails to show any activation in any pre-existing condition, whether it be tuberculosis, moderate chronic bronchitis, arthritis, neurasthenia, or any other alleged condition. The X-ray pictures taken before and after the accident show that the same condition existed at both times, according to the testimony of Doctors Thompson, Andrews, Carveth and Owen.

The law of this state on the burden of proof in a compensation case is properly stated in *Saxton v. Sinclair Refining Co.*, 125 Neb. 468, 250 N. W. 655, which held that, in order to recover in a compensation case, the burden is upon the plaintiff to show with reasonable certainty that his ailment was caused by the injury sustained, and this proof

must be made by substantial evidence leading either to the direct conclusion or to a legitimate inference that such is the fact. Cases so holding are too numerous to require citation.

It will thus be seen that the burden of proof is on the plaintiff in this case to prove by a preponderance of the evidence that the injuries complained of and the disability accruing therefrom resulted from the accident of July 30, 1937, and this tribunal is bound by the principle that awards for compensation cannot be based on possibilities or probabilities. *Bartlett v. Eaton,* 123 Neb. 599, 243 N. W. 772; *Townsend v. Loeffelbein,* 123 Neb. 791, 244 N. W. 418. See, also, *Milton v. City of Gordon,* 129 Neb. 888, 263 N. W. 208.

Plaintiff may have received some injuries of a temporary nature as a result of the accident. He has failed to meet the burden of proof, as required of him by the law of this state, as to the disabilities claimed by him in his pleadings. The court, in determining cases of this character on issuable facts, must take into consideration the credibility of the witnesses, the weight of the testimony, and the motivating circumstances surrounding a given situation; otherwise, the workmen's compensation law of this state would become an effective instrument of exploitation.

The judgment of the district court is reversed and the action dismissed.

REVERSED AND DISMISSED.

EBERLY, J., dissents.

JOHNSEN, J., concurring in part, dissenting in part.

I agree that the award in this case should be reversed, but not that the proceeding should be dismissed. I think it should be sent back to the workmen's compensation court for a new trial and further evidence.

As the record now stands, opposing medical experts have testified, on the one hand, that plaintiff is totally disabled from the accident involved and will continue so indefinitely, and, on the other, that he has absolutely no existing disability from the accident and is as able to work as he was

before it occurred. Among other incidents in the record, diametrically opposite physical interpretations are made of the same X-ray films. The question of disability turns, not on subjective symptoms of the claimant, but on the objective findings of the doctors. A determination of the controversy on the present record, therefore, means simply a conjectural evaluation of the professional credibility of the medical witnesses in the case.

I believe that compensation rights or liabilities ought not to have to depend on this questionable criterion. The legislature has declared that the administration of the workmen's compensation law is "affected with a vital public interest." Comp. St. Supp. 1937, sec. 48-162. That interest is entitled to some certainty in processes and results. A compensation trial cannot be allowed to degenerate into a medical experiment in judicial credulity or a judicial speculation on medical credibility.

The history of this case forcibly illustrates what I have in mind. The compensation court, first by the single judge who heard the case, and then, on a rehearing *en banc*, accepted the testimony of plaintiff's medical witnesses and gave plaintiff an award. The district court, to which an appeal in the nature of an error proceeding was taken, upheld the award because of the conflict in the evidence; but, according to the brief of appellant, the trial judge declared, that if he were hearing the case in the first instance, or *de novo*, he would have found in favor of defendant. On a *de novo* hearing here, some of the members of this court apparently believe the medical witnesses of plaintiff and others those of defendant. To me, the antipodal disagreement of these experts on whether demonstrable physical conditions exist or not is disappointing and bewildering. It shakes my faith a little in the skill of the medical profession or in its scientific impartiality. I do not want, in this situation, to be called upon to speculate on the question of personal credibility, but feel that the case should be sent back to the compensation court, with the request that it call in some disinterested members of the

medical profession and invite their cooperation to clarify the path, by making proper physical examinations and stating their findings in open court, subject to cross-examination by the parties. I believe that this procedure will clear up the Hippocratic shadows and bring the truth into sharper focus.

On the right of the compensation court to do what I am here suggesting, a reference to the statutes is sufficient. A discussion of the general power of a trial court to call witnesses will be found in 5 Wigmorè, Evidence (2d ed.) sec. 2484, and in 3 Chamberlayne, Modern Law of Evidence (1912) sec. 2376, but it is neither necessary nor useful to go into that subject here. The legislature has expressly declared that the compensation court has power to adopt all rules necessary to effectuate the public interest in the administration of the compensation law, and that it "may upon * * * its own motion require the production of * * * any facts or matters which may be necessary to assist in a determination of the rights of either party." Comp. St. Supp. 1937, sec. 48-167. It has also specifically authorized the judges of the compensation court "to examine under oath or otherwise any person * * * or any medical practitioner." Comp. St. Supp. 1937, sec. 48-153. These provisions include the right to call independent medical experts as witnesses; and, in a case such as this, where the furtherance of justice demonstrates its sound necessity, there should be no hesitation in exercising the power. No nonjudicial function is involved. *Jessner v. State,* 202 Wis. 184, 231 N. W. 634.

I had hoped that by remanding the case the organized medical profession might have joined us in accepting the challenge involved. The expert witness evil, which is a blight on judicial administration and a discredit to the medical profession, must sooner or later be faced. The procedure which I have here suggested would, I believe, effectively have demonstrated where the truth lies in the present case. I, for one, feel the need of a compass.

PAINE, J., dissenting.

I believe that the workman is entitled to compensation, and that his petition should not be dismissed, and therefore dissent from the opinion adopted by a bare majority of this court.

This case was argued to this court February 20, 1939, and involved such disputed questions of fact in the testimony of medical experts that several views could each be upheld, depending on which doctor's testimony was believed.

I desire to state the facts and law to support my views that this man, who is entirely helpless, is entitled to be compensated.

This is an appeal from an order of the district court, dismissing the appeal of the defendant to that court from an award of the compensation court sitting *en banc.*

On October 20, 1937, plaintiff filed petition in the Nebraska workmen's compensation court, alleging that on July 30, 1937, while employed as a mechanic by the Standard Auto Parts Company, Inc., of Lincoln, he was working under an automobile, and it slipped off the jack, crushed him to the floor, causing injuries to the left shoulder, left chest wall, and ribs, producing an active tuberculosis of the lungs. He further alleged that the injury was permanent; that his wages at the time of the injury were $18 a week.

A hearing was had December 22, 1937, before Honorable Frank M. Coffey, one of the judges of the Nebraska workmen's compensation court, at St. Elizabeth Hospital, where the plaintiff was being hospitalized.

Judge Coffey made an award on January 31, 1938, finding that plaintiff was injured while making adjustments under an automobile, as described in his petition, and found that previous to this accidental injury plaintiff had had a degree of tubercular infection, but that such infection had been arrested and plaintiff was able to perform manual labor, and was not receiving medical attention at the time of his accidental injury on July 30, 1937, which injury was the direct cause of lighting up the arrested tubercular con-

dition, and awarded payment of claims for hospital and medical services, together with $12 a week to plaintiff for not more than 300 weeks from July 30, 1937.

Defendant filed waiver of rehearing and notice of appeal directly to the district court, and certificate thereof was duly entered by the Nebraska workmen's compensation court.

On February 7, 1938, the plaintiff filed a petition for rehearing from the award entered by Judge Frank M. Coffey, setting up that he was suffering total and permanent disability as a result of active tuberculosis, and an aggravation of a latent arthritis. He also appealed from the disallowance of the claim of $240 of Dr. Arthur L. Smith, and its allowance in the sum of $140 only.

The next day defendant asked leave to withdraw its waiver and election to appeal directly to the district court, and also asked for a rehearing before the full Nebraska workmen's compensation court.

On March 7, 1938, it came on for rehearing before the three members of the workmen's compensation court sitting en banc at St. Elizabeth Hospital, where the evidence of the plaintiff was taken. The hearing was then concluded at the compensation courtroom in the State House, and the evidence duly taken by an official shorthand reporter of said court, in accordance with section 48-174, Comp. St. Supp. 1937, and each party rested. Thereupon, the parties were directed to furnish briefs to the court.

Thereafter, on May 9, 1938, an award was made by said court, describing the injuries received in the accident, and finding that prior to this accident plaintiff had a degree of tuberculosis infection, which had been arrested, and that he was not receiving medical attention at the time of the accident. The award allowed the plaintiff $12 a week for not to exceed 300 weeks from July 30, 1937, and set aside the award made on January 31, 1938, by Honorable Frank M. Coffey, which had allowed lesser amounts for hospital and medical services.

Thereupon, defendant appealed to the district court,

where a hearing was had on September 21, 1938. As was said in *Hansen v. Paxton & Vierling Iron Works*, 135 Neb. 867, 284 N. W. 352: "It will be noted that, where a retrial has been had before the full compensation court, the appeal authorized to the district court is limited in scope and is primarily in the nature of an error proceeding."

No further evidence was taken in the district court, and after the arguments of counsel said matter was taken under advisement, and judgment was entered October 22, 1938, finding that there is conflicting evidence in the record, but that there was competent evidence to support the award made by the Nebraska workmen's compensation court, and it was therefore ordered, adjudged, and decreed that the award so made on May 9, 1938, be affirmed, and the appeal of the defendant dismissed at defendant's costs. Thereupon, the defendant filed a motion for a new trial, and upon its being overruled, filed a supersedeas bond in the sum of $3,000 and appealed to this court.

When such an appeal comes before this court, it is provided "that a judgment, order, or award of the district court may be modified or set aside only upon the following grounds: (1) That the court acted without or in excess of its powers. (2) That the judgment, order or award was procured by fraud. (3) That the findings of fact are not conclusively supported by the evidence as disclosed by the record, and if so found, the cause shall be considered *de novo* upon the record. (4) That the findings of fact by the court do not support the order or award." Comp. St. Supp. 1937, sec. 48-174.

In the bill of exceptions it is shown that the evidence of the plaintiff was taken before the full compensation court on March 7, 1938, at St. Elizabeth Hospital, where plaintiff was confined, and more than a dozen X-rays were received in evidence when offered by plaintiff.

Dr. Smith testified that he had made 114 personal calls, and 17 physical examinations of plaintiff's chest and lungs, taken seven X-ray pictures at his office, and had six more taken at the hospital, also took tuberculin and sputum tests.

In his long description of plaintiff's chest, he said he found fractures of three ribs, and abundant evidence of former tubercular trouble, such as old hardened lesions, manifested by deposits of calcium in various parts of the lungs, and he got a positive tubercular test after 24 hours. Dr. Smith took up each X-ray exhibit, and told in detail the exact condition which it indicated. His conclusions may perhaps be inadequately condensed to these facts: That the plaintiff had a fracture of three ribs on the right side, an aggravation of arthritis in the dorsal vertebræ, a separation of the second left and right costocartilages from the sternum margin, and in his lungs there was an activation of an old tuberculosis; that all of these conditions are the proximate result of trauma suffered in the accident.

Dr. Czar Johnson testified at length of the conditions found by him, and that the proximate cause of these conditions was the accidental injury when plaintiff was crushed between a car and the cement floor. His specific findings agreed in nearly every detail with those of Dr. Arthur L. Smith.

The plaintiff introduced exhibit No. 17, being a five-page signed statement of Dr. Miles J. Breuer, dated January 5, 1930. This gives in greatest detail the results of a careful examination of plaintiff, made presumably in connection with plaintiff's claim for disability from the government. Briefly, it shows plaintiff's history, as follows:

He grew up on a farm and in lumber woods until he was 23 years of age, when he went to work on a cattle ranch in Texas for a year, then in a steel mill in Pueblo, Colorado, for two years, after which he entered military service. He was in training at Camp Custer, Michigan, three months, got sick from drilling and hiking in mud and water, was in hospital two weeks; was with A. E. F. in France nearly a year; on discharge, has never been able to hold a job since; willing, but not physically able to carry out the work. The statement ends with the sentence: "It is necessary that a chronic tuberculosis of this type, though it does not show extensive pathology, be recognized as a total disability."

I will now discuss the testimony of the medical experts called on behalf of the defendant.

Dr. John C. Thompson testified that he examined plaintiff at St. Elizabeth Hospital, together with Dr. Clayton Andrews and Dr. W. W. Carveth. The history which they took of plaintiff covers seven pages of testimony. He said his condition clearly indicated a childhood tuberculosis, which had not been active for a long time, but he found a complete absence of adult tuberculosis. He stated positively that he saw no evidence in the X-rays of any fractured ribs. One answer gives Dr. Thompson's conclusions in regard to plaintiff, as follows: "We have not only the X-ray findings, we have the history, got the interpretation of a mass of evidence through a period of time, and finally, we have what we had in this test, and that's nothing but bronchitis. Furthermore, especially on this X-ray, from this evidence of the blood pressure finding, I think this man is a deliberate liar."

In the examination of plaintiff by the three doctors, Dr. John C. Thompson took his blood pressure and found it 154 over 88, which he says is definitely aggravated for a man of his age. Later Dr. Andrews took it, and got it 142 systolic. Then later Dr. Carveth took it, and got 118. Dr. Thompson explains this by saying that, when they began their rapid cross-questioning and plaintiff was embarrassed, the blood pressure was high, and when the questioning stopped it dropped to 118. He adds that blood pressure readings are an important part of the instrument devised at Northwestern University for the detection of lies.

Dr. Carveth then told of the examination of the plaintiff by the three doctors for the defendant; that they began at 9:30 a. m. and finished at 12:30 p. m. on February 28, 1938; that they did not take any X-ray pictures, nor take any tuberculin test.

Dr. Carveth testified that in his opinion plaintiff's chronic alternating activity is not tuberculosis, but bronchitis.

Dr. Clayton Andrews could find no disability in the back due to arthritis, and no disability due to the accident, and

said there was no reason why plaintiff could not be doing as much work now as he did before the accident. He also doubted the sincerity of the plaintiff.

I have now given a very brief summary of the expert medical testimony of the defendant. These experts do not agree on any point with plaintiff's doctors, and defendant argues that we must find that Dr. Arthur L. Smith and Dr. Czar Johnson are entirely wrong, and Dr. Owen, Dr. Carveth, Dr. Andrews, and Dr. John C. Thompson are right, and set aside the award.

The evidence of Dr. Arthur L. Smith, who has been in constant attendance for so many months upon the plaintiff, is definite and positive, and founded upon a patient study of the case from day to day. It stands up well under cross-examination, and is supported by X-rays, and by the testimony of Dr. Czar Johnson.

On the other hand, the testimony of the three medical experts called in by the defendant, and who for three hours subjected him to such surprise tests and experiments that his blood pressure fluctuated between 118 and 154, is to the effect that they think the plaintiff is lying, and that the effect of the accident was merely trivial, and conclude that he is suffering from bronchitis, and not tuberculosis.

It will be seen that the decision in this case depends upon the weight to be given to the testimony of these expert medical witnesses.

Now, take a case where an unfortunate employee, who was not physically strong, but sought and obtained work, was injured while doing the very best he could, and has never been able to work a day since the injury, files a petition for compensation, and is only able to employ two reputable doctors; that their bills run to several hundred dollars. Is it required that their testimony be rejected because, if the employee secures an award, it will carry with it an allowance of their medical bills? I think not.

On the other hand, the defendant corporation, who is fighting the allowance of any compensation to an injured employee, is able to employ more than twice as many

equally reputable doctors, who testify exactly contrary on every proposition, including their testimony that the X-ray photographs tell an entirely different story when read by them.

I cannot believe that it resolves itself to a question that, as only two doctors testified for plaintiff and five or six against him, therefore the weight of the evidence is against allowing any award. Weight of evidence is not determined merely by counting the witnesses on either side.

To prove that this difficulty arising when eminent medical experts testify to exactly opposite conclusions existed sixty years ago, I quote from an article by G. Brooke Freeman in the Law Magazine and Review of London in February, 1878: "On some special branches of inquiry the same two eminent experts * * * confront each other daily. * * * When the evidence is only as to a matter of opinion, the witness, of course, cannot be indicted for perjury, and it is clear that this will allow the assertion of anything which a skilled witness may think likely to advantage the cause of his employer, or add importance to his theories and himself. The serious mischief caused in this way, added to the frequent inability of the court to obtain any other kind of evidence, or to arrive at a conclusion which does not depend mainly on such testimony, naturally produces great dissatisfaction with any decision in an expert action." Rogers, Expert Testimony (2d ed.) 468.

One of the earliest complete discussions of expert testimony is that following the case of *Hammond v. Woodman,* 66 Am. Dec. 219, 228-246 (41 Me. 177).

The situation presented courts by medical experts is covered by Jones, Commentaries on Evidence (2d ed.) 2509, sec. 1370, in this pertinent discussion: "It is the inherent infirmity of expert testimony that it consists largely of matters of opinion. In addition to those elements of weakness and uncertainty which enter into the testimony of those who relate simply what they have seen and heard, we have in expert testimony the deductions and reasoning of the witness with all the chances of error incident to human

reasoning. The notorious fact that experts of equal credibility and skill are found in almost every important cause testifying to directly opposite conclusions illustrates both the fallibility of such testimony and the fact that a conviction for perjury based upon such evidence would be very difficult. It is a matter of common observation in the courts that witnesses of the highest character and of undoubted veracity may be easily led as experts to espouse and defend a theory with all the zeal of the advocate. Again, the practice prevails of employing expert witnesses and paying them for their services, as compensation, amounts depending upon their skill, or, perhaps, the result of the action. These and similar considerations have led to those strictures upon expert testimony so often made in instructions to juries or in judicial decisions."

In an article on "Opinion Evidence of Medical Witnesses," by Henry W. Taft, of New York City, he quotes Dr. Sloan, president of Illinois State Medical Society, who says that in Civil Law countries of Europe "the expert is a part of the judicial system. He is an officer of the court and treated as such. * * * They are free from partisan bias, possessed of great judgment, a judicial mind, scientific experience and knowledge, and their expert opinions upon the questions submitted to them occupy a position like that of judicial opinions in weight and decisiveness."

On the other hand, in the United States a regrettable situation sometimes arises, for Mr. Taft quotes a committee of the American Bar Association to the effect that "medical witnesses in personal injury cases, dependent for their compensation upon the success of the side retaining them, 'magnify the seriousness and permanence of the injury, while the defendant's witnesses, although sure of their compensation from a responsible client, minimize the injury.'" 14 Va. Law Review, 81.

"The remedy therefore seems to lie in removing this partisan feature, i. e., by bringing him in court free from any committal to either party. Such a status for the expert would indeed not secure perfection. But it can be asserted

that no measure can be effective which does not secure such a status for the expert witness. How can this be done? The essential features, in the abstract, are that the state, not the party, shall be the one to pay his fee, and that the court, not the party, shall be the one to select and summon him." 1 Wigmore, Evidence, sec. 563.

"Expert witnesses are produced to support a certain theory by their opinions, often upon facts which have been detailed by others; they are frequently selected because of ability to express opinions which are favorable to the party who calls them and to whom they are to look for their compensation beyond that paid as witnesses' fees to all witnesses. Their opinions may be swayed one way or the other by bias or interest without conscious dishonesty. * * * Its value and usefulness are attested by the fact that resort to it is constantly increasing in all courts and in respect of an ever-widening range of subjects. Many cases are to be found in which expert testimony is commended and held not properly subject to deprecating remarks in the court's instructions, or else is declared to be entitled to the jury's unbiased consideration, free from the court's prejudicial remarks either in its favor or against it." 20 Am. Jur. 1058, sec. 1207.

An excellent article on medical experts, and the difficulties from their standpoint, is that by Dr. H. Mason Smith, of Tampa, and found in 8 Fla. Law Journal, 33.

In the case at bar, awards were made to this injured workman after both of the hearings before the compensation court, and affirmed in the district court, based upon the weight given to the expert medical witnesses for the plaintiff. The reasons for accepting their opinions, findings, and testimony, supported by the X-rays, seemed to be satisfactory to three courts. Why should this court reject such findings now?

It is true that injury resulting solely from disease is not compensable (*Svoboda v. Mandler*, 133 Neb. 433, 275 N. W. 599), but where the injury and a latent disease combined to produce disability, recovery may be allowed (*Gilcrest Lum-*

*ber Co. v. Rengler,* 109 Neb. 246, 190 N. W. 578), in which case a disease of the blood was aggravated by trauma. See, also, *Skelly Oil Co. v. Gaugenbaugh,* 119 Neb. 698, 230 N. W. 688.

The writer of this dissent, considering the liberality with which we must consider all compensation cases, believes that plaintiff suffered an injury in the accident, and is not yet able to work, and accepts the testimony of his doctors that the injury to his chest lighted up an old tubercular condition, which was dormant when he was injured and has now become active, and believes that this unfortunate is entitled to compensation.